WILLIAMS, J.
 

 | TIn this medical malpractice action, defendant, Christus Health Northern Louisiana d/b/a Christus Schumpert Health System, and intervenor, the Louisiana Patient
 
 *412
 
 Compensation Fund (“PCF”),
 
 [1]
 
 appeal a district court judgment, which entered a jury verdict and award in favor of plaintiffs. For the following reasons, we affirm.
 

 FACTS
 

 Elsie Simmons (“the decedent”) was admitted to Christus Schumpert Medical Center (“Schumpert”) on November 24, 2003, with a chief complaint of rectal bleeding. The decedent, who was 75 years old, had a history of hypertension but, otherwise, was in “pretty good” health. On November 26, 2003, the decedent underwent a colectomy and was admitted to the intensive care unit (“ICU”). She remained in the ICU and was recovering “fairly well” until December 2, 2003. On the afternoon of December 2, 2003, the decedent’s condition began to deteriorate; she became unresponsive, and a “Code Blue” was called. Several attempts to resuscitate the decedent were unsuccessful; she died at 6:28 p.m.
 

 On the day of the decedent’s death, Melissa Lindsey, a registered nurse, was her primary nurse. Nurse Lindsey’s shift began at 7:00 a.m. and ended at 7:00 p.m. According to Nurse Lindsey’s notes, the decedent began experiencing shortness of breath at 11:00 a.m., while sitting up in the chair in her room. Nurse Lindsey documented that she instructed the decedent to “take deep breaths” and encouraged her to use the incentive spirometer. |2The decedent’s oxygen saturation was 96-98% at that time. She was assisted back to bed at 1:00 p.m.
 

 The nurses’ notes further show that the decedent was examined by Dr. Calvin Alexander, a pulmonologist, at 1:45 p.m. Dr. Alexander made the following notations in the physicians’ progress notes:
 

 [Blood pressure] stable, [temperature max] 100.1. Awake, alert. Just vomited clear, yellow material. [No chest pain. Respiratory rate increased]. Lungs fairly clear [except decreased] breath sounds [in] both bases. She does not think she aspirated. 02 saturation] 94-97% [on room air].
 

 [[Image here]]
 

 Respiratory status, saturations] good on [room air]. Bilateral] effusions and ate-lectasis — [Respiratory rate increased] after vomiting.
 

 [[Image here]]
 

 Watch [respiratory] status — if she did aspirate, could get worse.
 

 [[Image here]]
 

 Dr. Alexander then wrote a series of orders, including:
 

 (1) Sign in room “All [chest xrays] upright”
 

 (2) [Chest xray] in AM
 

 (3) ABG for [increased or decreased respiratory rate], [decreased] 02 sat, [change in] mental status
 

 (4) Give extra neb[ulizer treatment] now
 

 (5) [Nothing by mouth] for now, ice chips this PM if [no nausea or vomiting], etc.
 

 (6) D5 1/2 NS @ 60 cc/hr
 

 The documentation reflects that the orders were “noted” by Nurse Lindsey; however, the respiratory nebulizer treatment that Dr. Alexander ordered was not done. The medical records also reveal that the decedent’s respiratory rate increased to 47 breaths per minute at approximately 3:00 p.m. The nurses’ notes do not indicate
 
 *413
 
 how long that rate was sustained, and Nurse Lindsey did not obtain an ABG as she was instructed. Additionally, the |snotes did not indicate whether the decedent was experiencing shortness of breath at that time. Nurse Lindsey noted that the decedent had vomited a “small amount” of yellow liquid and that there was no other change in the decedent’s condition or mental status.
 

 The decedent was seen by Dr. Lewis Barfield, a colorectal surgeon, at approximately 5:25 p.m. Dr. Barfield testified that he reviewed the chart and the ICU flowsheet, and the decedent’s vital signs were “fine” throughout the day. He stated that the decedent was awake and did not appear to be experiencing any distress or rapid breathing. Dr. Barfield ordered a bolus (a large dose) of intravenous fluids; Nurse Lindsey documented that she initiated the fluids at 6:00 p.m.
 

 Shortly thereafter, Dr. Wendall Wall, the decedent’s treating physician, entered her ICU room and observed that the decedent “looked unresponsive” and did not appear to be breathing. Dr. Wall also observed that the decedent had “copious amounts of brownish fluid coming out of her mouth.” According to Dr. Wall, the cardiac monitor showed “some type of rhythm or cardiac activity,” and he did not recall whether the monitor alarms were sounding. Because there was no one in the decedent’s room at that time, Dr. Wall called for someone to call a “Code Blue.” Nurse Lindsey documented that the emergency alert code was called at 6:05 p.m. The hospital’s Code Team responded to the code, but was unable to resuscitate the decedent; she was pronounced dead at 6:28 p.m.
 

 Following the Code Blue, a progress note was completed by Dr. Brian Caskey, the emergency room physician who responded to the code. Dr. RCaskey documented that during the code, he observed “copious yellow brown material in [the decedent’s] mouth [and] nose,” which he had to suction out before he could insert the endotracheal tube. Dr. Caskey also noted that the decedent had experienced a “respiratory arrest [secondary to] aspiration.”
 

 The decedent’s nine adult children, Gloria Fobbs, Shirley Simmons, Ronnie Simmons, Lorene Simmons Petteway, Brenda Simmons Henry, Raymond Simmons, Joyce Simmons Lynch, Burdette Simmons and Robert Ivery Simmons, filed a claim with the medical review panel, seeking to recover survival damages, as well as damages for the decedent’s wrongful death.
 
 [2]
 
 Essentially, plaintiffs alleged that Schum-pert failed to provide competent nursing personnel to care for the decedent in the ICU, and the decedent died as the result of “negligent and inadequate substandard medical care.”
 

 On September 26, 2006, the medical review panel issued an opinion finding that the evidence did not support the conclusion that Schumpert failed to meet the applicable standard of care. More specifically, the panel found that the nurses “acted reasonably in connection with the care provided to [the decedent].”
 

 On May 11, 2007, plaintiffs filed the instant lawsuit, alleging that Schumpert failed to conform to the appropriate standards of care. More specifically, plaintiffs alleged that the hospital: failed to provide the ladecedent with diligent, skillful care and treatment; failed to properly super
 
 *414
 
 vise the decedent’s medical treatment; failed to recognize and timely address the decedent’s deteriorating condition; failed to properly treat the decedent’s deteriorating condition; failed to obtain appropriate lab tests; failed to notify the physician of the decedent’s deteriorating condition; failed to properly monitor the decedent; failed to properly maintain monitoring equipment in proper working condition; and failed to properly utilize monitoring equipment.
 

 The matter was tried before a jury on September 15-18, 2009. The jury returned a 9-3 verdict in favor of plaintiffs, finding that Schumpert breached the standard of care in its treatment of the decedent, and the breach in the standard of care was a substantial factor in contributing to the death of the decedent. The jury awarded plaintiffs damages totaling $550,840.
 
 [3]
 
 The trial court signed a formal judgment in accordance with the jury’s verdict. Subsequently, the trial court denied Schumpert’s motions for judgment notwithstanding the verdict (“JNOV”) and new trial.
 

 Schumpert has appealed and the PCF has intervened in the appeal.
 

 DISCUSSION
 

 Liability
 

 Defendants contend the jury was clearly wrong in concluding that the hospital/nurses breached the applicable standard of care. Defendants argue that no reasonable factual basis exists in the record to support the jury’s ^conclusion that the nursing staff failed to render appropriate nursing care to the decedent in the hours leading up to her death. According to defendants, the decedent’s death was “sudden, acute and unexpected,” and no rational juror could find that the hospital staff was liable.
 

 In a malpractice claim against a hospital, the plaintiff is required to prove by a preponderance of the evidence, as in any negligence action, that defendant owed plaintiff a duty to protect against the risk involved, defendant breached its duty (or the applicable standard of care) and the injury was caused by the breach. See, LSA-R.S. 9:2794(A);
 
 Pfiffner v. Correa,
 
 94-0992 (La.10/17/94), 643 So.2d 1228;
 
 Ball v. Charter Forest Behavioral Health System, Inc.,
 
 41,329 (La.App.2d Cir.8/23/06), 938 So.2d 1092.
 

 Nurses and other healthcare providers are subject to the same standard as physicians.
 
 Cangelosi v. Our Lady of the Lake Regional Med. Center,
 
 564 So.2d 654 (La.1989);
 
 Ball, supra.
 
 The nurse’s duty is to exercise the degree of skill ordinarily employed, under similar circumstances, by members of the nursing or health care profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his or her best judgment, in the application of his or her skill to the case.
 
 Ball, supra; Hinson v. The Glen Oak Retirement Syst.,
 
 37,550 (La.App.2d Cir.8/20/03), 853 So.2d 726,
 
 writ denied,
 
 2003-2835 (La.12/19/03), 861 So.2d 572.
 

 Injury alone does not raise a presumption of negligence. Hindsight or subsequent events cannot be considered when determining whether the pactions of the nursing staff were reasonable and met the standard of care. Instead, the professional judgment and conduct of the nurses is
 
 *415
 
 evaluated under the then existing circumstances, not in terms of result or in light of subsequent events.
 
 Benefield v. Sibley,
 
 43,317 (La.App.2d Cir.7/9/08), 988 So.2d 279,
 
 writs denied,
 
 2008-2162, 2008-2210 (La.11/21/08), 996 So.2d 1107, 2008-2247 (La.11/21/08), 996 So.2d 1108;
 
 Little v. Pou,
 
 42,872 (La.App.2d Cir.1/30/08), 975 So.2d 666.
 

 The manifest error standard applies to the review of medical malpractice cases. Under the manifest error standard of review, a factual finding cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong.
 
 Benefield, supra; Wiley v. Lipka,
 
 42,794 (La.App.2d Cir.2/6/08), 975 So.2d 726,
 
 writ denied,
 
 2008-0541 (La.5/2/08), 979 So.2d 1284. In order to reverse a factfinder’s determination, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the factfinder is clearly wrong or manifestly erroneous. The appellate court must not reweigh the evidence or substitute its own factual findings because it would have decided the case differently.
 
 Benefield, supra; Harper v. Smith,
 
 42,586 (La.App.2d Cir.10/24/07), 968 So.2d 321,
 
 writ denied,
 
 2008-0010 (La.2/22/08), 976 So.2d 1287. The issue to be decided by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfin-der’s conclusion was a reasonable one.
 
 Benefield, supra; Wiley, supra.
 

 Where there are two permissible views of the evidence, the 18factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Where the fact-finder’s conclusions are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the trier of fact, because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said.
 
 Id.
 

 In the instant case, the jury heard testimony from seven of the decedent’s nine children, Nurse Lindsey, and multiple expert witnesses in the field of medicine and nursing. The jury was also provided with entries from the decedent’s medical records and a demonstration of the correct use and operation of the monitors in the ICU.
 

 Two of the decedent’s daughters testified with regard to the decedent’s condition on the afternoon of her death. Lorene Simmons Petteway testified that she visited the decedent that afternoon and her mother was experiencing marked difficulty breathing and was “fighting to breathe.” Petteway stated that she went to the nurses’ station and reported that the decedent was “having a problem breathing.” Petteway testified that the nurse told her that the decedent needed to breathe into the incentive spirometer. Petteway returned to the decedent’s room and discovered that the decedent was unable to use the spirometer. Petteway testified that she returned to the nurses’ station and informed the nurse of her mother’s problems. According to Pette-way, the nurse responded that “there was nothing they could do for her.” Petteway described the decedent’s condition and the situation as follows:
 

 _J_c|[S]he said that she just couldn’t — she wasn’t able to breathe. She was just gasping ... it looks like a person having an asthma attack, a real bad asthma attack. The words came out choppy. She could, like, get a word out and gasp, and she would get a word out, and it was hard for her to speak. And then I started saying stuff and then she would nod her head, stuff like that.
 

 
 *416
 
 Petteway testified that the decedent pulled herself up on the bed rail and attempted to breathe. Petteway also testified that the decedent was unable to call to the nurses’ station from her room because the nurses’ call light in the room did not work. She stated that she had been told that the light would be repaired; however, it was never repaired.
 

 Joyce Simmons Lynch testified that she had visited the decedent at every visiting hour that day and was very concerned about the decedent’s respiratory condition. She stated that she had informed the decedent’s nurse that the decedent “was having a hard time breathing,” and asked the nurse to call the doctor; the nurse told her that she would call the decedent’s doctor. Lynch also testified she talked to one of the decedent’s doctors herself, and the doctor told her that he was going to order a breathing treatment. She stated that when she went back to the decedent’s ICU room for the next visiting hour, the decedent was still experiencing difficulty breathing. Lynch testified that she expressed her concerns to the nurse, and the nurse told her that there was nothing she could do. Lynch stated that she talked to the nurse “several times” that day, expressing her concern for the decedent’s breathing. Lynch provided the jury with the following description of the decedent’s condition:
 

 She had gotten so bad she was sitting up in bed. She pulled herself up on the rail because she couldn’t catch | inher breath.
 

 [[Image here]]
 

 She was very agitated because her breath was short and ... she just kind of pulled up [on the bedrail] and propped up in a sitting position because I imagine she couldn’t breathe lying down. So she was just like taking breaths like for instance you can’t catch your breath.
 

 [[Image here]]
 

 She was able to talk just like a person getting it out barely because her breathing was real choppy and I didn’t think, you know, that she was going to make it, you know, for a long period of time the way she was breathing.
 

 [[Image here]]
 

 Nurse Lindsey testified that she had no independent recollection of the decedent or the events of the day in question. Her testimony was based on what she had documented in the decedent’s medical records. She stated that she did not recall speaking to any of the decedent’s family members, and she could not recall hearing any alarms sounding prior to Dr. Wall walking into the decedent’s room. When questioned about the decedent’s respiratory rate of 47 breaths per minute at 3:00 p.m., Nurse Lindsey stated that she did not recall how long the rate was sustained at 47. She also stated that she did not check the respiratory rate again to see if it remained elevated, and she did not document another respiratory rate until one hour later. Nurse Lindsey admitted that there was nothing in the hospital records to indicate whether the decedent sustained the increased respiratory rate for any significant period of time. She also acknowledged that the respiratory rate went from 47 to 32 to 19, but stated that she had no reason to be concerned about the decline in the rate.
 

 Dr. Calvin Alexander was accepted by the court as an expert in internal medicine, pulmonary disease and critical care medicine. HeJ^testified that he had been consulted to manage the decedent’s pulmonary status following her surgery. Dr. Alexander stated that the decedent was “stable,” but was not doing well enough to
 
 *417
 
 be transferred out of the ICU. He also testified that he examined the decedent early in the afternoon on the date of her death and noticed that she had vomited “clear yellow material.” He stated that he was concerned that the decedent had aspirated some of her gastric contents into her lungs and noted in his progress notes that the decedent’s respiratory status would be monitored because her condition would likely worsen if she did aspirate. Dr. Alexander testified that people who aspirate gastric contents into their lungs typically “get worse on a delayed basis.” He explained that foreign material in the lungs causes an inflammatory reaction and impairs the lungs’ ability to exchange gas. After examining the decedent on the day in question, Dr. Alexander wrote orders to address her respiratory status. During his testimony, Dr. Alexander discussed the order he had written with regard to obtaining an ABG if the decedent’s respiratory rate increased or decreased. He testified that if the respiratory rate of 47/min was not sustained, there was no need to obtain a ABG. However, if the decedent was complaining of shortness of breath, combined with a respiratory rate of 47/ min, he would have expected the nurse to obtain an ABG. He testified that the nurse never called him to inform him that the decedent was short of breath and never informed him that her respiratory rate had reached 47/min. Dr. Alexander stated that the ABG would have been necessary to determine whether the decedent was retaining carbon dioxide and was “tiring out” from increased respiratory 112effort. He testified that he did everything he could to prevent the decedent’s respiratory arrest by writing the orders for the nurse to carry out. Dr. Alexander also testified that the decedent was at risk for a pulmonary embolism (“PE”).
 
 [4]
 
 However, she was on prophylaxis to prevent blood clots, “[S]o I don’t think she was at a super high risk for [PE].” He further testified that the decedent did not experience swelling or tenderness in her calf or thigh that day to indicate that she had a blood clot. Dr. Alexander further testified that when he ordered the “extra nebulizer treatment now,” he did not expect the nurse and/or respiratory therapist to wait until the next scheduled treatment; he expected the treatment to be given at the time the order was written.
 

 Dr. Wendall Wall was accepted by the court as an expert in internal medicine. He testified that the decedent’s general health “was pretty good” at the time of her hospitalization. He stated that he had examined the decedent the day before she died and she did not have a markedly increased respiratory rate. Dr. Wall testified with regard to the events on the day of the decedent’s death. He stated that he walked into the decedent’s room and discovered her in bed with her head back and “copious amounts of brownish liquid was coming out of her mouth, and she looked unresponsive.” Dr. Wall testified that the decedent did not appear to be breathing, and no one was in the room with her. He stated that he went out of the room and called for someone to call a Code Blue. Dr. Wall also testified that he assumed that the decedent’s cause of death was aspiration “because she had a large 1 ^amount of fluid just streaming out of her mouth with her head back.” He stated that the decedent’s respiratory rate was over 40 breaths per minute approximately four hours prior to her death, so, in his opinion, “she just tired out.” He explained that elderly, post-operative patients “can’t continue to breathe over 40 respirations
 
 *418
 
 per minute very long because you will tire out ... get exhausted.” He further explained, “You get too tired, you can’t clear your airway because you’re breathing so fast, so you can’t really get a good cough, and that’s what can happen.” Dr. Wall also testified that Dr. Alexander’s progress notes reflected that the decedent had suffered respiratory difficulties earlier in the day. He also testified that there was nothing in the nurses’ notes to explain why the decedent’s respiratory rate was over 40. Dr. Wall opined that the decedent tired out, which led to her aspirating gastric contents into her airway, which, in turn, led to respiratory arrest. He also opined that it was more probable than not that aspiration was the cause of the decedent’s respiratory arrest and death. Dr. Wall further opined that if the aspiration had been addressed immediately, it is more probable than not that the decedent’s chances of survival would have improved. He testified that if the nurse had notified Dr. Alexander that the decedent’s respiratory rate was elevated and that she was short of breath, certain interventions could have possibly prevented her respiratory arrest and subsequent death.
 

 Dr. Brian Caskey was accepted by the court as an expert in emergency medicine. Dr. Caskey testified that he responded to the Code Blue, and arrived in the patient’s room while resuscitation efforts were 114already in progress: the decedent was being suctioned and attempts were being made to deliver 100% oxygen to the decedent .using an oxygen mask and Ambu bag. He stated that the code team was unable to successfully ventilate the decedent because gastric contents were obstructing her airway. Dr. Caskey testified that he assessed the decedent’s airway and found “copious” amounts of gastric contents in the decedent’s mouth, airway, nose and trachea. He stated that the presence of gastric contents in the airway hindered the decedent’s ability to get oxygen into her lungs. Dr. Caskey testified that he suctioned the decedent and placed an endo-tracheal tube into her airway. He also testified that “massive amounts” of gastric contents remained in the decedent’s airway, so he pulled the tube back, suctioned her again and reinserted the tube. Once the tube was in place, the decedent’s oxygen saturation was 97%; however, Dr. Caskey admitted that oxygen saturations obtained during a code are usually unreliable. He also testified that the decedent’s breath sounds were diminished, which was “most probabl[y]” associated with aspiration. He further testified that the monitor indicated that the decedent still had a heart rate at 6:05 p.m. However, he acknowledged that CPR was being performed on the decedent, and the heart rate and rhythm could have been associated with chest compressions. After the decedent was pronounced dead, Dr. Cas-key documented his impressions as follows: (1) respiratory arrest secondary to aspiration; (2) cardiac arrest; (3) post-op colon resection; (4) history of colon resection. Dr. Caskey testified that it is possible that the aspiration of gastric contents into the decedent’s lungs was the “primary event” leading to her respiratory arrest; 115however, it was possible that the decedent suffered “some other complication such as a [PE].”
 

 Dr. Richard Fincher, a member of the medical review panel for this case, also testified. He was accepted by the court as an expert in internal medicine, pulmonary medicine and critical care medicine. Dr. Fincher opined that a PE was “most likely” the decedent’s cause of death. However, he admitted that aspiration could have been the cause of death and that it would “not necessarily” take a massive amount of fluid to enter the lungs to cause immediate death. On cross-examination, Dr. Fincher
 
 *419
 
 admitted that he never actually examined the decedent and that his opinion as a member of the medical review panel was based on the records that had been submitted to the panel. He also admitted that the panel was not provided with the depositions of family members who testified regarding the extent of the decedent’s respiratory difficulties on the day of her death. Dr. Fincher also testified that the respiratory rate of 47/min would be significant if sustained, and that it would also be significant if accompanied by complaints of shortness of breath and difficulty breathing. He also stated that the decedent’s decline in respiratory rate, from 47 to 32 to 19, could indicate that she was “tiring out and having trouble breathing.” Dr. Fincher further testified that, if he had been the decedent’s physician, he would have wanted the nurses to notify him of the decedent’s declining respiratory condition that day. He also admitted that an ABG would have been helpful in assessing the decedent’s respiratory status because a pulse oximeter reading “does not tell everything you need to know.” Dr. Fincher admitted that it is | ^impossible to review the decedent’s medical records from the date in question and determine her respiratory status because the records do not indicate when she stopped breathing; the records only tell when Dr. Wall walked into the room and discovered the decedent unresponsive. Dr. Fincher also stated that the records indicate that the decedent had a cardiac rhythm, but do not indicate whether the rhythm was accompanied by a pulse. Furthermore, Dr. Fincher testified that if the decedent’s cause of death was a PE, it should have been discovered earlier in the day, since the decedent was complaining of shortness of breath and/or was in respiratory distress. He stated that an ultrasound could have been performed to determine if the decedent had a blood clot, and treatment could have been initiated. Dr. Craig Miller, an internal medicine physician and a member of the medical review panel, also testified. Dr. Miller opined that the one-time respiratory rate of 47 per minute was not significant because the decedent’s other vital signs were stable at that time, and the medical records contained no documentation that the decedent was in respiratory distress. Dr. Miller opined that, due to the “sudden” nature of the decedent’s death, she likely died as a result of a PE. He testified that it is possible, but “unlikely” that she aspirated. He stated:
 

 Usually, if someone aspirates[,] it would take a little bit longer for this to have occurred. You have a few more episodes of distress, things like that leading up to it. [A PE] would have been instantaneous. If it was a massive embolism, it would have led to the cardiac arrest.
 

 On cross-examination, Dr. Miller admitted that aspiration and subsequent 117respiratory fatigue was possible. He also admitted that nothing in the decedent’s records indicate that she had a PE; there was no pain or swelling in her lower extremities to indicate that she had a deep vein thrombosis that broke loose and traveled to her lungs. Dr. Miller further admitted that if the decedent was breathing rapidly at a sustained rate and tiring out, this could indicate that she had aspiration rather than PE. He agreed that the nurse should have addressed the concerns expressed by the decedent’s family.
 

 Dr. Lewis Barfield, the colorectal surgeon who assisted with the decedent’s surgery, testified that he saw the decedent less than one hour before her death. He stated that she did not appear to be in respiratory distress:
 

 I do remember seeing her sitting up in bed. She had a very small basin in her
 
 *420
 
 hand and then she had a little yellowish — she was spitting — she had just spit up a little yellowish type contents, but it didn’t appear to be a major emesis at that time[.]
 

 Dr. Barfield testified that he reviewed the decedent’s chart before going into her room and he was aware of her vital signs, oxygen saturation and respiratory rate throughout the day. However, he stated that he did not “know if [he] saw the last couple of respiratory rates.” He also testified that he did not know the cause of the decedent’s death. He speculated that the decedent’s death could have been caused by a fatal arrhythmia, PE or aspiration. • On cross-examination, Dr. Barfield admitted that he did not assess the decedent’s pulmonary status, but he had reviewed the pulmonary physician’s notes and orders. He stated that he did not address the decedent’s pulmonary status because he depended on the pulmonary | ^specialist to take care of those issues.
 

 Much of the testimony centered around Nurse Lindsey’s nursing experience and whether she was competent to care for an ICU patient. Nurse Lindsey testified that she worked primarily as a medical-surgical nurse and admitted that she had very little ICU experience. She also admitted that she had not received any ICU orientation and that, although she occasionally worked in the ICU, she was not an “ICU nurse.” Nurse Lindsey was certified in advanced cardiac life support; however, she admitted that she had not been trained in respiratory care or respiratory procedures; nor had she been trained in reading cardiac monitors, interpreting EKG strips or in recognizing cardiac arrhythmias. During cross-examination, Nurse Lindsey stated that she had “some exposure” to ICU during her nursing school clinicals.
 

 Joanne Gongora, a registered nurse, was accepted by the court as an expert in nursing, including ICU nursing. Gongora opined that Nurse Lindsey breached the applicable standards of care in the following regards: failing to call Dr. Alexander when the decedent’s condition required it; failing to ensure that the monitor alarms were on and functioning appropriately; failing to ensure that the nurse call button was operating; and failing to ascertain why the decedent’s pulse oximeter did not register a reading at 6:00 p.m. Gongora testified as follows:
 

 [T]he nursing standard of care was not carried out in regard to [the decedent]. The picture from all the information that I’ve reviewed was that on December 2, 2003, that she had a worsening respiratory condition that she didn’t get relief of [sic]. An order was — a couple [of] orders were written out that weré not— no evidence |iain the chart where they [were] carried out, such as that extra nebulizer treatment. The ABG, the arterial blood gas, being drawn[,] especially when that respiratory rate was 47.
 

 In my opinion the documentation, the nursing documentation, does not give a clear picture as to what was going [on] with [the decedent] this day[.] I don’t see really any nursing interventions that were done other than — in regards to her respiratory condition, but to encourage her to do the incentive spirometry, ... where I would expect to see that the nurse, in light of her respiratory status, that the nurse should document what’s happening], but then the last step in the nursing process is to evaluate those actions. So I don’t see where Ms. Lindsay observed [the decedent] doing the respiratory exercises where especially with this elevated rate and it was a prolonged elevated respiratory rate that any type of nursing intervention was actually done and then evaluated to see how well she responded.
 

 
 *421
 
 As I read through one family member’s deposition that there were repeated requests of the nurse to — you know, ‘[W]hen is the doctor going to come[?]’ There was an urgency ... by the family member, you know, ‘[H]ey, my mom’s getting worse when is the doctor coming, something needs to be done[.]’ [B]ut I didn’t see, based on the nursing documentation, that there was any sense of urgency at all. Otherwise, I think that the orders would have been carried out — the—how well the patient tolerated them and then was there an adequate response if not that would have required further intervention.
 

 Gongora testified that Nurse Lindsey “didn’t have very much ICU experience” and opined that Nurse Lindsey was not qualified to be working in the ICU. Gon-gora pointed out that Nurse Lindsey did not know how to operate the monitors and that she did not have an understanding of interpreting the monitor strips.
 

 Tonya Parker was also accepted by the court as an expert in nursing and ICU critical care nursing. Parker opined that Nurse Lindsey and the Schumpert nursing staff provided the appropriate standard of care forj^nursing. On cross-examination, Parker admitted that it is a breach in the standard of care whenever a nurse fails to carry out a physician’s order. She also admitted that failing to ensure that the nebulizer treatment ordered by Dr. Alexander was done and failing to obtain an ABG if the elevated respiratory rate was sustained constituted breaches in the appropriate standards of care. Parker further testified that Nurse Lindsey should have called Dr. Alexander if the decedent’s respiratory rate was elevated and the decedent was short of breath to the point that she had difficulty speaking.
 

 Ginger McVigars, Schumpert’s director of nursing operations and resources, also testified. She stated that during the decedent’s hospitalization, she was the director of the adult critical care, progressive care and telemetry units. McVigars testified that Nurse Lindsey completed the hospital’s general orientation when she was hired and had completed several in-house courses, including courses on pulmonary assessment, ABG analysis and caring for patients on cardiac monitors. On cross-examination, McVigars admitted that there was no documentation that Nurse Lindsey had received ICU orientation, stating that she “assumed” that Nurse Lindsey had received the requisite orientation because she was working in the ICU.
 

 There was also much testimony with regard to whether the decedent’s monitor alarms were on or off that day and whether the alarms were sounding at the time the decedent’s condition became life-threatening. At the beginning of the shift and throughout the day, Nurse Lindsey documented in the chart that the monitor alarms were “on.” Nurse Lindsey testified that the alarms on the monitor were on all day, and the limits had Uibeen set prior to the beginning of her shift. She admitted that she did not know how to set or adjust the alarm limits; she also testified that she did not hear any alarms sounding prior to Dr. Wall entering the decedent’s room. Dr. Wall testified that when he entered the decedent’s ICU room and found her unresponsive, his attention was centered on his patient, and he could not recall whether the alarms were sounding. However, Dr. Wall admitted that had the alarms been sounding, he would have expected someone to be in the decedent’s room. Dr. Caskey testified that health care providers sometimes turn pulse oxim-eter alarms off and/or silence the alarms. He also testified that hospital staff do not always respond to pulse oximeter alarms because they go off “pretty frequently.”
 
 *422
 
 There is no documentation indicating that the alarms were placed on “silent mode.”
 

 McVigars testified and demonstrated the use of the Space Labs monitor during the trial. She testified that a person can tell whether or not the alarms are on or off just by looking at the monitor. She also stated that when the alarms are turned off, all monitor strips generated by the system will contain a display stating “ALM OFF.” McVigars also testified that it is possible to turn one alarm off without turning off all of the alarms.
 

 After hearing all of the evidence, the jury concluded that Schumpert breached the standard of care in its treatment of the decedent, and the breach was a substantial factor in contributing to the death of the decedent. After a thorough review of the decedent’s medical records and the testimony adduced at trial, we conclude that a reasonable factual basis exists for the jury’s findings on the issue of liability.
 

 | 22Two of the decedent’s daughters testified that the decedent was in respiratory distress all afternoon and that they had expressed their concerns to the decedent’s nurse. Other than encouraging the decedent to use the incentive spirometer, the nurse did not do anything to address the decedent’s respiratory condition. The medical records indicate that Dr. Alexander was concerned about the decedent’s respiratory status earlier that afternoon. In a progress note written at 1:45 p.m., Dr. Alexander expressed his concern about possible aspiration, documenting “Watch r[espiratory] status—if she did aspirate, could get worse.” He then wrote a series of orders to address the decedent’s condition; there is no documentation to show that the nebulizer treatment was done; no ABG was obtained to ascertain the extent of the decedent’s respiratory deterioration. Dr. Wall’s testimony shows that he was of the opinion that the decedent’s downward spiral began early in the afternoon. He testified that the patient’s respiratory status declined, and she eventually “tired” out, lost the ability to clear her airway and stopped breathing. Overall, the jury was obviously persuaded that the nursing staff either did not recognize the decline in the decedent’s condition or simply failed to address it. The medical evidence did not establish the specific time that the decedent stopped breathing, or whether the monitor alarms sounded to alert the nursing staff that her respirations had ceased.
 

 For these reasons, we cannot say that the jury was clearly wrong in finding that Schumpert or the nurses breached the standard of care by failing to recognize and timely treat the decedent’s deteriorating condition, failing | ^to notify the physician of the decedent’s condition and failing to properly monitor the decedent. Additionally, we cannot say that the jury was clearly wrong in finding that the breach in the standard of care was a substantial factor in the death of the decedent. This assignment lacks merit.
 

 Motion for JNOV
 

 For the same reasons, we reject Schumpert’s contention that a JNOV was warranted because “the evidence and testimony did not support the jury’s verdict[.]”
 

 A JNOV is warranted only when the facts and inferences, viewed in the light most favorable to the party opposing the motion, are so strongly and overwhelmingly in favor of the moving party that reasonable men or women could not arrive at a contrary verdict; the motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men or women could not reach a different conclusion, not merely when there is a preponderance of the evidence for the mover.
 
 Welch v. Willis-Knighton Pierremont,
 
 45,554 (La.App.2d
 
 *423
 
 Cir.11/17/10), 56 So.3d 242, citing
 
 Peterson v. Gibraltar Savings and Loan,
 
 98-1601 (La.5/18/99), 733 So.2d 1198.
 

 In the instant case, in denying the motion for JNOV, the trial court stated:
 

 [T]he jury having heard the evidence in the case made certain inferences and conclusions based on that evidence. I think the testimony of Dr. Wall was instrumental and I think the jury made certain inferences with respect to the alarm monitoring system based on Dr. Wall’s testimony.
 

 I also think that the jury was unimpressed with Nurse I^Lindsey. It’s my view that Nurse Lindsey had a very cavalier and careless attitude here in open court in front of a jury. I would tend to think a nurse facing a jury ... in a medical malpractice case would be on her extra good behavior, but nevertheless, my impression of her which I think is consistent with the jury’s impression of her was that she was cavalier ... I think from which they inferred further that she was more probabl[e] than not cavalier during her treatment of [the decedent] at Schumpert. And I think that that inference could be also reached by the medical record and her charting that was placed in evidence.
 

 I also believe that the jury could very well infer that she was not properly trained to be an ICU nurse[.] Now, the jury, I think, could have inferred reasonably from the evidence adduced that the monitor system was not functioning properly for whatever reason on that day.
 

 [[Image here]]
 

 I still think this is a close case, but the jury voted nine to three, rendered a verdict which I cannot say is unreasonable and I cannot say that it reaches the level required for the granting of a motion for JNOV[.]
 

 * * *
 

 We have reviewed this record in its entirety. We also find that the evidence does not point so strongly and overwhelmingly in favor of Schumpert that reasonable men or women could not reach a contrary conclusion. Consequently, we find no error in the trial court’s ruling denying the motion for JNOV. This assignment lacks merit.
 

 Evidentiary Ruling
 
 — Death
 
 Certificate
 

 Defendants also contend the trial court erred in allowing the decedent’s death certificate to be admitted into evidence. Defendants argue that the medical records established that the decedent died on December 2, 2003; therefore, the death certificate was irrelevant and redundant.
 

 Complaint of an alleged erroneous evidentiary ruling “may not be predicated upon a ruling which admits or excludes evidence unless a ^substantial right of a party is affected.” LSA-C.E. art. 103. The trial court is granted broad discretion in its evidentiary rulings, which will not be disturbed absent a clear abuse of that discretion.
 
 Graves v. Riverwood Intern. Corp.,
 
 41,810 (La.App.2d Cir. 1/31/07), 949 So.2d 576,
 
 writ denied,
 
 2007-0630 (La.5/4/07), 956 So.2d 621. Where evidence is admitted that is merely cumulative of other evidence in the record, any error in its admission is harmless.
 
 Graves, supra.
 

 On appeal, the court must consider whether the complained-of ruling was erroneous and whether the error affected a substantial right of the party affected. If not, a reversal is not warranted.
 
 Id.,
 
 citing LSA-C.E. art. 103(A). The determination is whether the error, when compared to the record in its totality, has a substantial effect on the outcome of the
 
 *424
 
 case, and it is the complainant’s burden to so prove.
 
 Id.
 

 In the instant .case, the record is replete with testimony that the decedent died on December 2, 2003, and aspiration may have been the cause of the decedent’s death. The medical records contain a “death note” prepared by Dr. Wall, in which he listed aspiration as a cause of the decedent’s respiratory arrest. Dr. Cas-key’s “code note” stated, “Respiratory arrest [secondary to] aspiration[.]” Therefore, we find that the death certificate was merely cumulative of other evidence in the record. Even if the trial court erred in allowing the death certificate to be admitted into evidence, we find that defendants have failed to show any prejudice as a result of the trial court’s ruling. The assignment lacks merit.
 

 12(jEvidentiary Ruling
 
 — Rhythm
 
 Strips
 

 Defendants further contend the trial court erred in excluding from evidence the rhythm strips generated during McVigars’s demonstration of the SpaceL-abs monitor. Defendants argue that the monitor strips should have been placed into evidence to demonstrate the difference between a strip that was generated as the result of an alarm and a strip that is generated manually.
 

 The trial court disallowed the strips from being introduced into evidence, stating:
 

 I think the strips are really demonstrative in nature and they are part of the presentation by Ms. McVigars.
 

 [[Image here]]
 

 The jury has seen the demonstration and I’m incline[d] in overall analysis to believe that they should not be formally admitted as evidence.
 

 After review, we find no error in the court’s refusal to allow the introduction of the monitor strips generated during the expert witness’s demonstration into evidence. The jury was able to observe the demonstration during the trial and was able to see the strips as they were being generated. Additionally, McVigars testified during the trial that the strips generated from an alarm clearly indicated that it was an “alarm” strip. Additionally, any error in the refusal to admit the strips into evidence is harmless, as defendants have not shown that the trial court’s ruling had any substantial effect on the outcome of the case. This assignment lacks merit.
 

 Jury Instructions
 

 Defendants also contend the trial court erred in refusing to instruct the jury on “record-keeping.” Defendants argue that the court’s failure to |CTinclude the requested jury instruction tainted the jury’s verdict, necessitating an independent review of the record by this court.
 

 During the trial, Schumpert submitted a proposed jury instruction, which read as follows:
 

 Any inadequacies in the record keeping or documentation in the hospital records are not actionable unless you find such inadequacies, if any, resulted in harm to the patient.
 

 The trial court refused to include the instruction, stating:
 

 My concern with that charge is that I think it could be tantamount to an impermissible comment on the evidence along the lines of an inference or as I’m saying it to the jury an implication to them perhaps that I think there are an inaccuracies [sic] in the record. So I’m not here to comment about that one way or the other and my concern was that that might amount to an impermissible comment on the evidence one way or the other. And furthermore, I believe that is a question of argument for the jury.
 
 *425
 
 You both talked about it in the closing arguments as you should and I think the jury understands that every single record is going to have some imperfections and so therefore, I don’t need to state the obvious and risk commenting on the evidence.
 

 In
 
 Adams v. Rhodia, Inc.,
 
 2007-2110 (La.5/21/08), 983 So.2d 798, the Supreme Court stated:
 

 Adequate jury instructions are those which fairly and reasonably point out the issues and which provide correct principles of law for the jury to apply to those issues. The trial judge is under no obligation to give any specific jury instructions that may be submitted by either party; the judge must, however, correctly charge the jury. If the trial court omits an applicable, essential legal principle, its instruction does not adequately set forth the issues to be decided by the jury and may constitute reversible error.
 

 Correlative to the judge’s duty to charge the jury as to the law applicable in a case is a responsibility to require that the jury receives only the correct law. Louisiana |2sjurisprudence is well established that an appellate court must exercise great restraint before it reverses a jury verdict because of erroneous jury instructions. Trial courts are given broad discretion in formulating jury instructions and a trial court judgment should not be reversed so long as the charge correctly states the substance of the law. The rule of law requiring an appellate court to exercise great restraint before upsetting a jury verdict is based, in part, on respect for the jury determination rendered by citizens chosen from the community who serve a valuable role in the judicial system. We assume a jury will not disregard its sworn duty and be improperly motivated. We assume a jury will render a decision based on the evidence and the totality of the instructions provided by the judge.
 

 However, when a jury is erroneously instructed and the error probably contributed to the verdict, an appellate court must set aside the verdict. In the assessment of an alleged erroneous jury instruction, it is the duty of the reviewing court to assess such impropriety in light of the entire jury charge to determine if the charges adequately provide the correct principles of law as applied to the issues framed in the pleadings and the evidence and whether the charges adequately guided the jury in its deliberation. Ultimately, the determinative question is whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice.
 

 Id.
 
 at 804 (internal citations omitted).
 

 We find that the trial court herein did not err in refusing to instruct the jury with regard to the effect of “inadequacies” in record keeping. A careful review of the record demonstrates that throughout the trial, both parties commented on the fact that the record herein was “imperfect.” The instruction regarding record keeping was not an essential legal principle which was necessary for the jury to decide whether Schumpert and/or its employees breached an applicable standard of care. Thus, the trial court had no obligation to give the jury that specific instruction. As the reviewing |2flcourt, we must exercise great restraint before disregarding a jury verdict and conducting a
 
 de novo
 
 review of the record. The jury instructions given by the trial court adequately provided the correct principles of law. Defendants’ mere suggestion that the instructions were so erroneous as to be prejudicial does not automatically trigger a
 
 de novo
 
 review of
 
 *426
 
 this record. We find no error in the trial court’s ruling. This assignment lacks merit.
 

 Motion for New Trial
 

 Defendants also contend the trial court erred in denying the motion for new trial. Defendants argue that the motion for new trial should have been granted because of the alleged misconduct of one of the jurors.
 

 In the motion for new trial, Schumpert alleged that one of the jurors, David Brewer, conducted internet research, “printed out some of his research results and brought the printed material with him during deliberations, wherein he shared the printed information with other members of the jury.” The trial court conducted an evidentiary hearing on the matter, during which two of the members of the jury testified.
 

 Connie Rogers, the juror who brought Brewer’s conduct to the attention of defense counsel, testified at the hearing. Rogers stated that during deliberations, members of the jury were discussing oxygen saturations and heart rates. At that time, Brewer “produced a piece of paper from his pocket” and indicated that he had conducted research from the internet. Rogers testified that she did not look at the document, but some of the other jurors did look at it.
 

 Brewer admitted that he engaged in internet research and that he |soprinted “one little section” which addressed health issues such as respiratory rates. He testified that he took the document into the jury deliberations room and he shared it with “whoever wanted to see it” after the initial vote was taken. Brewer also testified that none of the other jurors had any printed materials during deliberations; however, one of the jurors was a respiratory therapist and “kind of showed [the jurors] what that meant.”
 

 LSA-C.C.P. art. 1973 provides that “[a] new trial may be granted in any case if there is good ground therefor, except as otherwise provided by law.” LSA-C.C.P. art. 1972(3) provides, “A new trial shall be granted, upon contradictory motion of any party when the jury ... has behaved improperly so that impartial justice has not been done.” Improper behavior of a jury is not specifically defined by statute or jurisprudence, but must be determined by the facts and circumstances of each case.
 
 Williams v. Super Trucks, Inc.,
 
 36,993 (La.App.2d Cir.4/9/03), 842 So.2d 1210,
 
 writ denied,
 
 2003-1303 (La.9/5/03), 852 So.2d 1042;
 
 Smith v. Bundrick,
 
 27,552 (La.App.2d Cir.11/3/95), 663 So.2d 554.
 

 A new trial is mandated only upon a showing of jury misconduct which is of such a grievous nature as to preclude the impartial administration of justice.
 
 Williams, supra; Bossier v. DeSoto General Hosp.,
 
 442 So.2d 485 (La.App. 2d Cir. 1983),
 
 writ denied,
 
 443 So.2d 1122 (La.1984). Otherwise, the granting of a new trial is left to the sound discretion of the trial court.
 
 Id.
 
 A decision to deny a motion for new trial based upon jury misconduct is reviewed based on an abuse of discretion standard.
 
 Wright v. Hirsch,
 
 560 So.2d 835 (La.1990);
 
 Williams, supra.
 

 |s1Not every instance of jury misconduct necessitates the granting of a new trial.
 
 Williams, supra; Gormley v. Grand Lodge of the State of Louisiana,
 
 503 So.2d 181 (La.App. 4th Cir.),
 
 writ denied,
 
 506 So.2d 1227 (La.1987). The burden falls upon the mover to prove that the level of the behavior was of such a grievous nature as to preclude the impartial administration of justice.
 
 Brown v. Hudson,
 
 96-2087 (La. App. 1st Cir.9/19/97), 700 So.2d 932,
 
 writ
 
 
 *427
 

 denied,
 
 97-2623 (La.1/9/98), 705 So.2d 1103,
 
 cert. denied,
 
 524 U.S. 916, 118 S.Ct. 2297, 141 L.Ed.2d 157 (1998).
 

 In
 
 Smith, supra,
 
 the plaintiff filed a lawsuit, alleging medical malpractice. Following an unfavorable jury verdict, the plaintiff filed motions to set aside the verdict and for a new trial, alleging jury misconduct. At the hearing on the post-trial motions, two jurors testified that, during the jury’s deliberations, the jury foreman gave the jury a dictionary definition of the term “malpractice.” The trial court denied the motions, and this court found no abuse of discretion. This court stated:
 

 [T]he plaintiffs counsel failed to elicit any testimony to indicate that the foreman’s discussion of the dictionary definition of the term “malpractice” unduly influenced the jurors’ decision or their assessment of the evidence presented during the trial. The evidence adduced at the hearing does not support plaintiff’s claim that juror misconduct occurred which was so grievous as to prevent the jury from reaching an impartial verdict.
 

 Id.
 
 at 556.
 

 In the instant case, in denying the motion for new trial, the trial court stated:
 

 [I] do think and I do find that David Brewer did commit |sajuror misconduct. He brought into the jury deliberation room extraneous outside information which he should not have brought into that room.
 

 [[Image here]]
 

 The question that I am faced with is whether or not it had a grievous effect on the impartial administration of jus-tiee[.]
 

 [[Image here]]
 

 There’s no doubt that David Brewer should not have done it and there’s not doubt that he is guilty of juror misconduct, but based on my review of [the document Brewer printed] and based on my listening to the testimony of Mr. Brewer I’m unable to conclude that what he did-is so grievous and so egregious that it justifies a new trial.
 

 We agree. The trial court did not abuse its discretion in denying the motion for new trial. The testimony adduced during the hearing did not demonstrate that the printed material provided by Brewer unduly influenced either the jurors’ decision or their assessment of the evidence presented during the trial. Although Rogers testified that she did not look at the information, she was clearly not influenced by it, as she voted in favor of defendants. Brewer admitted that he voted in favor of plaintiffs; however, he did not testify that his decision was influenced by the research he had conducted. Therefore, we find that the evidence adduced at the hearing fails to prove that juror misconduct occurred which was so grievous that the jury was prevented from reaching an impartial verdict.
 

 Survival Damages
 

 Next, defendants contend the jury was clearly wrong in awarding survival damages. Defendants argue that plaintiffs produced no evidence to show that the decedent experienced pain and suffering prior to her death.
 

 | ¡^Survival damages may be awarded for the pre-death mental and physical pain and suffering of the deceased. In determining survival damages, the factfinder should consider the severity and duration of any pain or any pre-impact fear experienced by the deceased, and any other damages sustained by the deceased up to the moment of death.
 
 Cavalier v. State ex rel. Dept. of Transp. and Development,
 
 2008-0561 (La.App. 1st Cir.9/12/08),
 
 *428
 
 994 So.2d 685. Survival damages are properly awarded if there is even a scintilla of evidence of pain or suffering on the part of the decedent, and fright, fear, or mental anguish during an ordeal leading to the death is compensable.
 
 Id.
 

 A survival action permits recovery only for damages actually suffered by the deceased from the time of injury to the moment of death.
 
 Id.; Etcher v. Neumann,
 
 2000-2282 (La.App. 1st Cir.12/28/01), 806 So.2d 826,
 
 writ denied,
 
 2002-0905 (La.5/31/02), 817 So.2d 105. Where there is no indication that a decedent consciously suffered, an award of pre-death physical pain and suffering should be denied.
 
 Id.
 
 The question of whether the decedent actually consciously suffered is a factual issue, governed by the manifest error-clearly wrong standard.
 
 Id.
 

 In the instant case, the medical records indicate that the decedent experienced shortness of breath at approximately 11:00 a.m. Dr. Alexander examined the decedent at approximately 1:45 p.m., was concerned that she may have aspirated and wrote orders to address her respiratory status. Dr. Wall testified that the decedent more than likely “tired out” after experiencing difficulty breathing all afternoon. The testimony of the [^decedent’s daughters, Gloria Fobbs and Joyce Simmons Lynch, was particularly compelling. They both testified that the decedent had been experiencing extreme difficulty breathing for much of the day. Fobbs testified that the decedent had stated, “[I]f ya’ll don’t do something for me I don’t think I’m going to make it.” After hearing the evidence, the jury was persuaded that the decedent suffered pain and suffering prior to her death. We find that the jury’s conclusion is amply supported by the evidence. This assignment lacks merit.
 

 Wrongful Death Damages
 
 — Shirley
 
 Simmons and, Robert Ivery Simmons
 

 Finally, defendants argue that the jury was clearly wrong in awarding wrongful death damages to Robert.Ivery Simmons and Shirley Simmons. Defendants argue that neither Robert Simmons nor Shirley Simmons was present at the trial, and there is no evidence that they suffered any loss of love and affection as a result of their mother’s death.
 

 LSA-C.C. art. 2315(B) authorizes the recovery of loss of consortium, service, and society as damages by the spouse and children of an injured person. These elements of damages include such pecuniary elements as loss of material services and support and such nonpecuniary components as loss of love, companionship, affection, aid and assistance, society, sexual relations, comfort, solace, and felicity.
 
 Jenkins v. State, Dept. of Transp. & Dev.,
 
 2006-1804 (La.App. 1st Cir.8/19/08), 993 So.2d 749,
 
 writ denied,
 
 2008-2471 (La.12/19/08), 996 So.2d 1133. The elements of a child’s claim for loss of service and society are essentially the same as those of the injured person’s spouse without, of course, the sexual component of spousal ^consortium.
 
 Id.,
 
 citing
 
 Moore v. Safeway, Inc.,
 
 95-1552 (La.App. 1st Cir.11/22/96), 700 So.2d 831,
 
 writs denied,
 
 97-2921 (La.2/6/98), 709 So.2d 735, 97-3000 (La.2/6/98), 709 So.2d 744.
 

 In
 
 Welch v. Willis-Knighton Pieiremont, supra,
 
 one of the plaintiffs did not personally appear at trial. The defendant moved to dismiss that plaintiff, and the trial court granted the motion. This court reversed that ruling and awarded damages in favor of that plaintiff.
 

 In the instant case, we have thoroughly reviewed the testimony of the decedent’s surviving children, who could be present to testify at the trial. All testified of the family’s close relationship, the special bond
 
 *429
 
 the decedent shared with each of her children and the devastating effect of the decedent’s death on all of her children. Specifically, Joyce Simmons Lynch provided unrefuted testimony about the “very close relationship” the decedent and the decedent’s daughter, Shirley Simmons, shared. Lynch testified that the decedent and Shirley spent a lot of time together running errands and reading the Bible. She also testified that Shirley was unable to take time off from work to attend the trial. Based on the record before us, we find that the jury did not abuse its discretion in awarding an equal amount of damages to the plaintiff, Shirley Simmons.
 

 Lynch also described the relationship between the decedent and the decedent’s son, Robert Simmons. She stated that Robert and the decedent maintained a “very close” relationship. Lynch also testified that Robert and the decedent often spoke on the telephone, the decedent visited Robert “quite often” and the decedent’s death has been “really hard on him.”
 

 lsfiThe record shows that Robert Simmons is currently serving a life sentence at Angola and has been incarcerated for over 20 years. Based on his sister’s testimony, Robert and his mother communicated by telephone often, and the decedent visited him “quite often.” The jury heard this testimony and still voted to award damages to each of the decedent’s children, including Robert. The trial court formally entered the jury verdict, and declined to grant either the defendant’s motions for JNOV or new trial. The record supports the trial court’s findings and conclusions.
 
 [5]
 
 We find no error or abuse in discretion in either the finding of liability or the general damages awarded to each of the decedent’s surviving children. Consequently, we affirm the lower court’s judgment.
 

 CONCLUSION
 

 For the reasons stated above, the judgment of the trial court in favor of plaintiffs and against Christus Health Northern Louisiana d/b/a Christus Schumpert Health System and the Patients Compensation Fund is affirmed. Costs of the appeal are assessed to defendants, Chris-tus Health Northern Louisiana d/b/a Christus Schumpert Health System and the Patients Compensation Fund.
 

 AFFIRMED.
 

 [1]
 

 . The PCF was not named as a defendant in the lawsuit; however, the trial court’s judgment awarded damages to be paid by the PCF. Therefore, on December 2, 2010, this Court issued an order, ordering the trial court to serve the PCF with the notice of judgments. Consequently, the PCF is now a party to this appeal.
 

 [2]
 

 . The estate of the decedent’s husband, Ivery Simmons, was also a plaintiff in the lawsuit. Mr. Simmons was alive at the time of his wife’s death, but died before the lawsuit was filed. No damages were awarded to the estate of Mr. Simmons, and plaintiffs did not appeal the award.
 

 [3]
 

 . The jury awarded $ 100,000 in survival damages for the decedent’s "pre-death fear, anxiety, pain and suffering;” $50,000 was awarded to each of the decedent's nine children for the "loss of love, affection and companionship of [Mrs.] Simmons, grief and anguish;” and $840 was awarded for medical expenses.
 

 [4]
 

 . A pulmonary embolus occurs when a blood clot is formed in the lower extremities and breaks loose and travels to the major blood vessels in the lungs.
 

 [5]
 

 . Sometimes, there is a finding of some degree of estrangement from the family, when a child is serving a lengthy sentence of confinement. However, the evidence presented in this case does not support this finding.