MOORE, J.
11 Carolyn McFann appeals the trial court’s judgment dismissing a personal injury claim filed on behalf of her 14-year-old son, Otis, against Southwestern Electric and Power Company (“SWEPCO”). *1279 McFann alleged that Otis was electrically shocked and sustained serious injuries by SWEPCO’s negligent failure to properly secure a disconnected, live electrical service line, which Otis cut into, using pruning shears. The trial court dismissed the suit, holding that SWEPCO had not breached any duty to plaintiff, where it appeared that Otis intentionally cut into the line and had failed to prove the personal injuries allegedly caused by the incident, except perhaps a minor superficial flash burn to the side of Otis’s face. We affirm.
Facts
A storm passing through the Shreveport area on September 16, 2002 had caused a large tree limb to fall on the electrical service line to the McFann house, pulling the weatherhead and service meter off of the house and apparently sending sparks flying. The fire department and SWEP-CO were contacted.
A SWEPCO employee, James Lindsey, made the service call and arrived at the home to find the weatherhead and meter on the ground. He cut the two 120-volt insulated lines and the uninsulated neutral wire from the weatherhead. He taped the exposed ends of the wires. Lindsey rolled up the line into a 3-feet diameter circle and affixed it to the utility pole with tape. The bottom of the circle of wires was three or four feet off the ground and located on the side of the pole opposite the tree limb.
1 .¿Lindsey told Ms. McFann that she would need to hire an electrician to repair the connection to the house and restore electricity to the house. Ms. McFann testified that Lindsey told her that the wires were dead. Lindsey denied ever making such a statement.
Later that day, Ms. McFann’s son, Otis, began cutting branches from the downed tree limb with a pair of rubber-handled pruning shears. Otis testified that he did not see the wires due to the leaves and branches from the fallen limb when the shears cut into the wire. The shears created an arc between the two 120-volt lines and flashed. Much of the dispute in this case is whether Otis actually received an electrical shock or simply a minor skin burn from the heat of the flash.
James Lindsey testified that after the accident he was told by his supervisor, Jimmy Huelett, that in the future he should tape the wires twelve to fifteen feet above the ground. Lindsey also testified that he had been shocked several times during the eleven years he has worked as a electrical service technician by both 120 and 240 volts of electricity. He stated that being shocked by 120 or 240 volts would not make an entry or exit wound because it was far too little voltage. Lindsey testified that he has seen individuals who had entry and exit wounds from being shocked from very high voltages of electricity. When this occurs, he said, the entry wound occurs at the point of entry of the electricity.
The defendant introduced photographs taken at the scene of the incident into the trial record. The photographs show the location of the pruning shears, which remained stuck to the wire where Otis had started to |3cut them, and the location of the foliage and branches nearby. The pruning shears had rubber grips. Lindsey testified that the rubber grips on the shears provided sufficient insulation to prevent Otis from being shocked. Additionally, Otis’s rubber (tennis) shoes should have prevented him from being shocked because the shoes would insulate the person from the ground.
Lindsey explained that electricity always seeks the ground by traveling through something connected to the ground that is not insulated in order to release its power. A lone, 120-volt line is known as “phase to ground,” and if a person comes into contact with an exposed (uninsulated) line, it *1280 would attempt to send the voltage through the person to find the ground to discharge its “load,” unless the person is insulated by rubber gloves, rubber grips, or shoes. On the other hand, Lindsey said, when two 120-volt lines are combined, as in this case, it creates a 240-volt load, and is called “phase to phase.” If these two lines are somehow connected by something that conducts electricity, they will attempt to discharge their load into each other (phase to phase), causing intense heat and a flash.
Lindsey testified that if a person cuts into the two 120-volt wires with the pruning shears, he or she will likely not be electrically shocked because the electricity from each wire will travel to the other wire (phase to phase), causing an arc and a fire. He said any damage to a person would not be from voltage, but a person could get burned (from the heat of the flash) if they were close enough to it.
Jimmy Huelett testified that he told Lindsey after the accident that he should have taped the wire to the utility pole 12 to 15 feet above the ground. |4He said this is the general practice, and he wrote Lindsey up for improper job performance. The only reason why wires are sometimes left within reach of a person on the ground, he said, is to enable the electrical repair man brought in to reconnect the lines to the house to do so without having to call a SWEPCO employee back out to bring the line down. Huelett testified that it would be possible [but not likely] that a person could receive some damage from cutting into a service line with pruning shears even while wearing tennis shoes. However, on cross-examination, he clarified that he did not think that a person would be shocked in that situation because the electricity could not travel through the body to the ground. It would stay at the wires, which, he said, is what causes the flash.
Huelett also testified that he visited the McFann residence after the accident. He said Otis McFann was sitting on the porch at the house. Otis told him that he did not receive a shock, but that it felt like he received a sunburn on the side of his face. Huelett said it was not unusual for a flash from the wires to cause that type of minor burn. Huelett said he suggested to Ms. McFann that she may want to get Otis examined by a doctor to be safe. He said Otis did not complain of any injury to his foot. The only injury Huelett saw was some redness on the right side of Otis’ face. He asked Ms. McFann to get in touch with him if there was anything wrong. Huelett never heard from her again.
Huelett stated that in his experience he had never seen entry or exit wounds caused by someone being shocked by 120 or 240 volts. He said he personally was shocked once by 480 volts, but he did not receive any entry | fior exit wounds.
He testified that when he arrived, the shears were still attached to the wires. He also testified that SWEPCO has a frequent problem with people cutting their wires and selling them for scrap.
Both Huelett and Lindsey testified that the service wire came from a transformer on the utility pole and within the transformer there is a safety fuse. They stated that if a person caused a ground fault (phase to ground), that is, if the person was electrically shocked, it should have blown the fuse in the transformer. The transformer fuse in this case was not blown; nor did it blow, moreover, when the tree limb tore the line down from the house.
Carolyn McFann testified that her neighbor wanted the wood from the fallen limb for his fireplace and wanted to make sure the wires were dead. She testified that Lindsey told her the wires were dead. For this reason, she said Otis was sent to trim the limb.
*1281 McFann further testified that when she came home, Otis was standing with the clippers (attached to the wire) shaking, and had to be pulled off the clippers. She did not state who pulled him from the clippers. She said after they pulled him from the clippers, they brought him inside the house and placed him on the couch. She said she shook him and he woke up, and he was sweating. She said she called an ambulance and then called SWEPCO and complained that her son just got electrocuted. The only burn mark she saw was under Otis’s eye and that his eyebrows were burned off. Otis also complained his foot was hurting.
IfiMs. McFann said that she waited for the ambulance, but it did not come timely, so she took Otis to the emergency room herself. She said they gave him medication and put a Band-Aid over (i.e., above) his eye. She said Otis complained of his right eye and right foot. She said that she asked the ER physician about his foot. She said there was a hole in his foot where the electricity came out. By “hole” she meant a circle. The circular spot on Otis’s foot was the size of a quarter and red. Otis stayed in the hospital four days under observation. She said that Otis subsequently suffered embarrassment because his eyebrows were burned off, and attributed several illnesses to the incident.
After leaving the hospital, Ms. McFann kept Otis home from school for approximately one month. She took him to Dr. Rousseau on October 24, 2002. Dr. Rousseau saw Otis again in January, September and November of 2003. Ms. McFann also took Otis to see Dr. Jeffrey E. Faludi, an opthamologist on March 6, 2003 and Dr. David M. Cooksey, a dermatologist on March 18, 2003. The depositions of these three physicians are in the record.
Dr. Rousseau stated that he first saw Otis in May of 2002 for dermatitis and gastroenteritis. He next saw Otis on October 24, 2002, one month after the accident, but said his records did not indicate that Otis reported that he had been electrically shocked. At this visit, Otis reported pain in his right leg, but did not mention his foot, nor did he report problems with his eye. Dr. Rousseau concluded that the pain in his leg was due to some trauma, such as a fall. He said that it was possible that he sustained |7the injury if he fell after being electrically shocked. The subsequent visit in January was regarding asthma. In September 2003, Otis complained of pain in his left foot which Dr. Rousseau attributed to flat feet, and the November 2003 visit concerned gastroenteritis.
Dr. Rousseau reviewed the ER records. He said the usual concern of an injury from electrical shock is the heart, indicated by the EKG and urinalysis. These records indicated Otis had 20/20 vision (normal), his EKG was normal, and there was no blood in his urine. The records also indicated that Otis denied any chest pain, headaches, numbness, tingling in his hands, arms or legs, and denied skin changes in his extremities or muscle pain indicative of electrical shock.
Otis visited Dr. Faludi, an opthamologist, on March 6, 2003, complaining of blurred vision which he attributes to the accident. Initially a nurse tested Otis’s vision and recorded results of 20/60 vision in one eye and 20/30 in the other. Dr. Faludi then examined Otis and concluded that Otis had 20/20 vision. He said the examination revealed no abnormalities and there was nothing to indicate any superficial injury to the eye. When asked to explain the discrepancy between the vision test of his nurse and his own, Dr. Faludi explained that the test is based on the subjective responses of the patient, and the patient may not be accurately depicting what he sees or trying his best.
*1282 Otis visited Dr. Cooksey, a dermatologist, on March 18, 2003. Dr. Cooksey saw no signs of scarring, hyper pigmentation or other signs of electrical burns on the skin of Otis’s right eyelid, forehead or cheek. He did |ssee an area of hyper pigmentation or dark skin in the middle of the plantar aspect of his right foot; however, he said he could not tell if it was caused by a burn or some other injury.
Ms. McFann testified that the only physician that would help her was a Dr. To-gen, who worked in a neighborhood clinic. She said Dr. Togen is also a minister. This was approximately 5 months after the incident. Dr. Togen put Otis in the hospital for X-rays of Otis’s left hip and right foot. McFann attributed the physicians notes referring to Otis’s left hip and the X-ray of same as a mistake. It was his right hip that hurt him, she said.
At this time, she said Otis was suffering from leg and foot pain, asthma, stomach problems and pain in his right eye. Ms. McFann had discontinued working to stay at home with Otis. Otis transferred from Woodlawn to Southwood and from South-wood to Hamilton Terrace because of too many absences and “attitude” problems, which McFann and Otis attributed to the incident.
Ms. McFann subsequently admitted that the reason she was not working was because she was laid off. To reconcile this inconsistency with her prior testimony that she quit her job to take care of her son, she said she was laid off because she missed too much work to take care of her son.
Otis McFann testified that he did not cut the wire intentionally. He said that he was cutting branches and the next thing he knew he woke up in the living room of the house. He denied that the right side of his face was hurting. He said he had a bad headache and his eye would not open all of the way. He said all of his eyebrows were burned off.
| flOtis testified at trial that he saw the wire near the bushes prior to the accident. At his deposition, he testified that he did not see the wire prior to the accident. He said that the accident caused him to have blurred vision, foot cramps and now he can’t get along with people.
After the .taking of evidence, the court ruled for SWEPCO- from the bench, basing its ruling largely on credibility determinations. The trial judge found that the testimony of Ms. McFann and Otis was contradicted by the medical evidence. The court concluded that there was no injury to Otis other than the minor skin burn to his face caused by the flash. He noted that the McFanns’ testimony was not consistent with their deposition testimony, and they were simply not credible.
The court stated that Mr. Huelett was the most credible witness. Huelett’s report stated that Otis reported that he did not receive a shock, but that the side of his face around his eye felt like sunburn. Although the court acknowledged that Otis suffered a minor injury, it was not com-pensable because SWEPCO was not at fault. Based upon the pictures in evidence, the court ruled that it was obviously SWEPCO’s pole and wire and nobody had any business cutting it. He concluded that the wire was cut intentionally.
The court subsequently signed a judgment dismissing the plaintiffs claims.
Discussion
Appellant raises two assignments of error.
By her first assignment, appellant argues that the trial court was linmanifestly erroneous in determining that SWEPCO was not responsible for the injuries sustained by Otis McFann due to its negligence in handling the power lines.
*1283 Appellant contends that it is entitled to a de novo review because the court couched the decision as a credibility determination. Counsel requests that this court conduct a de novo review and base its decision on the medical record.
In reviewing the record of trial, an appellate court is not in a position to ascertain the tone in which a witness responds to questions, nor his or her demeanor. These factors and others play a critical role in a fact finder’s evaluation of a witnesses’ credibility. For this reason, great deference is afforded the trier of fact in determinations of credibility, and accordingly, the “manifest error” or “clearly erroneous” standard was established to preclude any de novo review of the factual findings of a trial court by a court of appeal. Mount Mariah Baptist Church, Inc. v. Pannell’s Associated Electric, Inc., 36,361(La. App. 2 Cir. 12/20/02), 835 So.2d 880, writ denied, 2003-0555 (La.5/2/03), 842 So.2d 1101.
Appellant argues that “but for the negligence of SWEPCO, Otis McFann would not have been injured.” Counsel contends that Mr. Lindsey negligently placed the power line on the utility pole only three feet from the ground instead of 12 to 15 feet and told Carolyn McFann that the wire was dead and presented no danger to them, and it was Lindsey who told Carolyn McFann that it was her responsibility to cut the branches that had fallen near the wires. Counsel contends that even if Lindsey did not tell Ms: McFann Inthe lines were dead, SWEPCO would be comparatively at fault because the lines were placed too low to the ground in violation of SWEPCO’s own practices. Hence, even if Otis was negligent or intended to cut the line, the accident would not have occurred but for SWEPCO’s negligence.
On the one hand, counsel argues SWEP-CO, through its employee Lindsey, breached its duty by placing the wires on the pole too low to the ground. The problem with this view is that, even though Lindsey’s act of placing the power line three feet above the ground may have violated company protocol, it was not this breach of company policy that caused the harm. The service line hanging on the pole did not cause the injury to Otis and posed no risk to Otis. In fact, because the wires were insulated, they posed no greater risk to Otis than an ordinary household electrical extension cord lying within easy reach of a person. Both Lindsey and Huelett testified that one could handle the wires without being shocked because they are insulated.
On the other hand, counsel for appellant argues that the cause of the accident, that is, the reason why Otis cut the wires instead of a branch, was because the wires were placed among or in close proximity to the branches of the fallen limb such that Otis could not see them. The problem with the latter position is that the photographs of the accident scene reveal that the wires were, in fact, not hidden from plain view and not really mingled with the tree branches. Although they were near some of the branches, it appears that one would have to make an effort to cut the wires. Otis stated that he saw the wires before he started cutting. The trial court found, based upon |12the pictures of the accident scene and the testimony, that Otis intentionally cut into the wires. We find no manifest error in this finding.
Although the appellant does not argue that the wires presented an “attractive nuisance,” we conclude that the doctrine will not apply here even though electricity, in some circumstances, such as uninsulated power lines, can be “inherently dangerous.” The attractive nuisance doctrine requires that the condition or agency causing injury must be of such an unusual nature or character as to render *1284 it peculiarly attractive to children. See Nguyen v. Crescent Land and Development Co., Inc., 88CA107 (La.App. 5 Cir. 6/7/88), 527 So.2d 456, writ denied, 88C2158 (La.11/11/88), 532 So.2d 769. That electricity is dangerous is common knowledge even for a 14-year old. In this case, however, Otis stated that he knew electrical wires were dangerous.
For these reasons, we conclude that the trial court did not manifestly err in finding no liability on the part of SWEPCO in this case.
By her second assignment of error, the appellant alleges that the trial court erred in allowing Jimmy Huelett and James Lindsey to testify as experts. Appellant argues that the trial court erroneously relied on Huelett’s non-expert testimony to determine the extent of Otis McFann’s injuries. Huelett did testify regarding his knowledge of electricity and his experience as to what kind of damage electrical shock can cause. He also testified regarding his observation of the pruning shears and that Otis told him that he had not been shocked.
| ^Appellant contends that the trial court ignored all the evidence that Otis had been shocked by the electricity and relied on Huelett’s testimony to determine the extent of Otis’s injuries. He contends that Huelett was not qualified to diagnose Otis’s medical condition.
In fact, Huelett made no medical determinations in the case, nor did he testify as to Otis’s medical condition. He simply stated that Otis told him he had not been shocked, but that his face felt like it was sunburned, which is consistent with the testimony that the shears caused the wires to flash, but did not send any voltage into Otis because the shears were insulated and the nature of the phase to phase 240-volt system.
Finally, we note that Otis’s medical records do not support the conclusion that the physical complaints of Otis were related to electrical shock.
Appellant also argues that the court erred by allowing James Lindsey to testify regarding the effects of electrical current on the body. Lindsey testified that he had never seen an entry or exit wound caused by 120 or 240 volts of electricity to the body. The court allowed the testimony based upon Lindsey’s 11 years of experience as an electrical service technician. Appellant claims that this was not a proper foundation for expert testimony.
We find no error in allowing this testimony. Lindsey was certainly qualified to testify as to his experience and observations from working 11 years in this industry. Lindsey did not testify as a medical expert, nor did his testimony appear as such.
|uFinally, appellant contends that the court abused its discretion in failing to award general or special damages for Otis McFann’s injuries. It contends that Otis suffered headaches, backaches, leg and foot pain, blurred vision, first or second degree burns on his face and feet, and embarrassment and humiliation.
As previously stated, the medical testimony explicitly fails to make any connection between the ailments claimed by Otis and any evidence that Otis suffered an electrical shock. SWEPCO denied that Otis received an electrical shock, but concluded that Otis received a minor flash burn to the right side of his face. This conclusion was based on statements made by Otis to SWEPCO, the testimony of experienced technicians, the medical record and observations of physicians. Otis’s later complaints that they were the result of electrical shock were inconsistent and unsupported by the medical testimony.
As stated by the trial court, the testimony and medical evidence shows that Otis *1285 suffered a minor, first-degree flash burn to the right eye area of his face due to his own actions in cutting the service line with pruning shears.
Conclusion
For these reasons, we find no manifest error in the findings and conclusions of the trial court, and we affirm the judgment of the trial court at appellant’s cost.
AFFIRMED.