BROWN, Chief Judge.
|! This is a tort case arising out of the death of Henry White, III, who suffered a heatstroke following an intensive outdoor run which was part of an “unorganized” and unauthorized basketball team practice at Grambling State University on August 14, 2009. Because of the severity of the heatstroke, Henry’s body went into Disseminated Intravascular Coagulation, and he died on August 26, 2009. Plaintiff, Tiffany Williams, the mother of Henry’s biological son, Gavin, filed suit on Gavin’s behalf seeking wrongful death and survival damages from defendants, the Board of Supervisors for the University of Louisiana System a/k/a/ Louisiana Board of Trustees for State Colleges and Universities, and Grambling State University.[1]
Jury trial was held January 28 through February 4, 2013. In accordance with the jury form signed, dated and filed on February 4, 2013, in favor of plaintiff, with 100% fault allocated to defendants, the trial court rendered judgment in plaintiff’s favor awarding damages totaling $1,595,771. It is from this judgment that defendants have appealed. Defendants are not contesting liability; their appeal raises only evidentiary and procedural issues. For the following reasons, we affirm.
| ¡Facts and Relevant Procedural History
After having played two years of junior college basketball, Henry White, III, whose home was in Wisconsin, accepted a scholarship to play basketball at Gram-bling State University (“GSU”) beginning in the fall of 2009. Henry arrived on campus on August 12, 2009, several days past the mandated reporting time for basketball players, which was August 9th. He attended a brief team meeting where school registration, upcoming practice schedules and general program information were discussed. Players who reported to campus after August 9th were told of an “unorganized” practice they were required to attend which would be held on August 14th and would include weight lifting and conditioning.
On August 13th, the night before the scheduled practice, Henry and some teammates went to a nightclub in the Gram-bling area. One of his teammates, Rydell Harris, stated that Henry had a few drinks and may have been “buzzed.” Henry stayed until the bar closed, then went back to his dorm room. The weight training/conditioning practice started at 2 p.m. on August 14th. At that time, Henry was fine, according to Rydell. After the weight lifting portion of the workout, *808 which lasted approximately two hours and involved each player “maxing out” on various exercises, Henry and the other players who arrived at GSU after the August 9th date were told they would run a 4.5 mile conditioning run around the campus. The players were' informed that they were' required to finish the run in 45 minutes; the penalty for refusing to run was possible suspension from the team.
IsCoach Stephen Portland followed the runners in a golf cart. There was no water provided to the players, although it was a hot August afternoon, with a temperature of 91 degrees and a heat index of around 100 degrees. Henry and Rydell Harris, who was also new to GSU, did not know the route, and they were told to follow the older players in front of them. Henry’s physical on file with GSU showed that he was a “healthy 21-year-old male with no restrictions to sports participation.” Henry finished the required 4.5 mile run in the top half of the runners. Rydell, who finished the run ahead of Henry, turned around to look for him and saw another teammate carrying an unconscious Henry into the gym. At that point, Coach Portland was about ten minutes from the gym as he was supervising the remaining runners still on the course. The players carried Henry into the gym and tried to give him water from a nearby fountain; he was unconscious, so they began splashing water onto him with their hands in an attempt to cool him down. When Coach Portland finally arrived at the gym, he learned that Coach Stitt had called the head athletic trainer, Jessica Robinson, who was at the football field overseeing practice.[2] Ms. Robinson called 911, then hurried to the gym. She observed that Henry was pale and clammy, and he was breathing rapidly and mumbling. Because he was ^unconscious, he was unresponsive. Ms. Robinson had several players help her ice Henry down to lower his core temperature.
When EMS workers arrived at the gym, Henry’s condition was already critical. They noted his unresponsive condition. An IV line was started and he was treated with ice packs.[3] He was transported to North Louisiana Medical Center, and his core temperature upon admittance was 104.2 degrees. Henry was transported to LSUMC. As a result of the heatstroke, Henry’s body went into Disseminated In-travascular Coagulation, which causes the proteins in the body to break down and become irreversibly damaged. The cells in all of the body’s organs break apart and release waste into the bloodstream, and this waste from the cells causes clots to form throughout the bloodstream and in every organ. When this happens, the body loses all of its clotting factors and begins to bleed horribly. At the same *809 time, the body continues to clot throughout, which deprives the body of oxygen.
Henry underwent kidney and liver dialysis, and he was put on a ventilator in the ICU. He was confused and disoriented, he could feel pain, and he had difficulty breathing even while on the ventilator. By the fifth day of his hospitalization, Henry had a swollen stomach and eyes, jaundice, and bloody fluid coming out of his feeding tube. An exploratory laparotomy on his bowels showed that a large portion of Henry’s small intestine had become necrotic and was beyond saving, so that portion was | ¡¡removed. On the eighth day, doctors cut holes and the upper and lower parts of Henry’s abdomen, pulled the remaining bowel through the skin, and attached bags to drain the fluid accumulating in his stomach. At that time, five cups of blood were taken out of Henry’s abdomen. He had blood clots in his mouth, and there was blood draining into his ostomy bags. On day 12, a repeat exploratory laparotomy showed that Henry’s bowel was completely gangrenous. Henry died the next day, which was August 26, 2009.
The procedural history of this case as it relates to the instant appeal primarily involves the court’s recognition of a Wisconsin paternity judgment and several evi-dentiary rulings. On October 28, 2010, a certified, authenticated judgment rendered by a Wisconsin court declaring that Henry White, III, was the father of Gavin Williams was filed ex parte by plaintiff. That same day, the trial court rendered judgment making this Wisconsin judgment executory in the instant action as a judgment establishing filiation.
Following the completion of discovery, defendants filed several motions in limine to exclude, inter alia, the testimony of several witnesses, specifically: William Trinkle, Thomas Stallworth, Zoe Meeks, Leigh Steinberg, and Todd Thoma, as well as several exhibits. These motions were denied by the trial court via judgment on January 29, 2013.
Plaintiff filed several motions in limine to exclude, inter alia: evidence of character and prior bad acts of Henry White, including reference to prior alcohol and marijuana use/abuse and an arrest for possession of cocaine; evidence of a positive drug test for marijuana in 16Henry’s medical records on the date of his initial treatment for heatstroke; lab test results for consumption of alcohol the evening before Henry’s heatstroke; evidence relating to the personal life of one of plaintiffs expert witnesses; witness testimony regarding the relationship between Henry, Tiffany Williams and Gavin; evidence of underlying medical conditions of the decedent; evidence of the negligence or fault of the EMTs; any testimony or inference that Henry White was not the father of Gavin; and, medical records from North Louisiana Medical Center and LSUMC.
The trial court granted plaintiffs motions in limine and excluded: evidence of the character and prior bad acts of Henry White, including reference to prior alcohol and marijuana usage and his misdemeanor arrest for possession of cocaine; reference to plaintiffs expert witness’s personal issues; evidence of a positive drug test for marijuana in Henry’s medical records on the date of initial treatment for heatstroke; any evidence on the issue of whether Henry was Gavin’s father; any evidence about personal relationships except for the relationship between Henry and Gavin; the testimony of Henry White’s mother and stepfather; and, any reference to underlying medical conditions that Henry White may have had.[4]
One of the jury instructions defendants included in their pretrial proposed jury *810 charges, filed on January 18, 2013, had to do with the limitation of liability on the state and its political subdivisions and |7contained language about the statutory cap set forth in La. R.S. 13:5106(B)(2):
The total liability of the state and political subdivisions for all damages for wrongful death of any one person, including all claims and derivative claims, exclusive of property damage, medical care and related benefits and loss of earnings or loss of support, and loss of future support, as provided in this Section, shall not exceed five hundred thousand dollars, regardless of the number of suits filed or claims made for the wrongful death of that person.
Plaintiff agreed to defendants’ proposed instruction.
Trial began on Monday, January 28, 2013, and ended on Monday, February 4th. On Friday, February 1st, defendants objected to the instruction they had proposed, seeking to have it removed from the jury charges. Plaintiff objected, asserting that an instruction to the jury regarding La. R.S. 13:5106 was necessary since at trial, defendants’ main defense had been that Grambling and the state were impoverished and, by implication, unable to pay any judgment rendered against them. Plaintiff submitted a charge very similar to the original one proposed by defendants. Thereafter, defendants filed a supplemental jury charge which sought to have Subsection (E) of La. R.S. 13:5106 included; Subsection (E) contains language which, inter alia, provides that because judgments against public entities have exceeded the state’s ability to pay currently, such judgments threaten the public fisc “to the extent that the general health, safety, and welfare of the citizenry may be threatened,” which is consistent with defendants’ primary defense strategy, that defendants lack the financial resources to pay a judgment.
Plaintiff objected, and on Monday, February 4th, the trial court ruled that the instruction proposed by plaintiff, a simpler version of defendants’ |Roriginal charge regarding La. R.S. 13:5106, would be included in the jury instructions.[5] An emergency writ filed with this Court was denied. According to the trial court, “the inclusion of (E) in the jury charge would have been totally inappropriate,” as it contained inflammatory language and could inject an improper political statement into the jury charges. Defendants, for the first time, then requested that a charge including the definitions in Subsection D(2) be given, since the jury was to be instructed on La. R.S. 13:5106(B)(2). The trial court denied this request as unnecessary, finding that the simple statement set forth in La. R.S. 13:5106(B)(2) provided the jury with an accurate, full statement of the pertinent law.

Discussion

Evidentiary Rulings

Evidence and Testimony Related to Alleged Drug Use of Henry White III and NCAA and University Policy Regarding Drug Test Results of Athletes

Defendants assert error in the trial court’s evidentiary rulings excluding: evi *811 dence of a positive THC urine drug screen obtained upon Henry White’s admission to North Louisiana Medical Center; evidence of a prior criminal arrest and prior alcohol and marijuana use; and, evidence of Grambling’s drug testing policy. According to defendants, all of this |9evidence was relevant and admissible, and its exclusion tainted the jury verdict.
Except as otherwise provided by law, all relevant evidence is admissible. La. C.E. art. 402. Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. C.E. art. 401. However, relevant evidence may be excluded if, among other things, its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. La. C.E. art. 403. The trial judge has great discretion in determining the relevancy and probative value of evidence, and in striking the balance between relevancy and prejudicial effect, and his determinations will not be overturned absent a finding of a clear abuse of discretion. Entergy Gulf States, Inc. v. Louisiana Public Service Commission, 98-1235 (La.04/16/99), 730 So.2d 890; Hooker v. Wal-Mart Stores, Inc., 38,244 (La.App.2d Cir.03/03/04), 867 So.2d 869; Tramontin v. Glass, 95-744 (La.App.5th Cir.01/30/96), 668 So.2d 1252.
In ruling that defendants would not be allowed to introduce any evidence about the positive urine drug screen results from North Louisiana Medical Center or make any reference to marijuana use, the trial court stated:
[T]he court had a chance to review the various motions in limine yesterday, and I did zero in on this issue as one of the more important issues ... to be addressed prior to voir dire.
I am concerned about this level of evidence. There is some dispute as to the results, whether the results were positive, whether the results |inwere negative, if it was first a positive result and then later a negative result.... I am cognizant of Dr. Thoma’s testimony with respect to the marijuana usage and the THC content in the body of this young man who later became the deceased. I am concerned about the prejudicial effect of this, which classified under law is bad act evidence. Possession of marijuana is a misdemeanor crime, and I am concerned based on what is in the record that this really is a matter for Article 403 and the balancing test. And of course, 403 says that although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury or by considerations of undue delay or waste of time.
I am concerned about the prejudicial effect of this, which classified I think that the danger of unfair prejudice with respect to this line of evidence is great. I think the probative value is very limited and under the Article 403 balancing test, it is my opinion that this is inadmissible evidence and that’s my ruling.[6]
*812 |nThe trial court’s ruling excluding this evidence as well as evidence of Grambling Athletic Department’s drag testing policies for student athletes (which did not meet the relevancy requirement of La. C.E. art. 402) was not an abuse of discretion.
Regarding the exclusion of evidence of alleged past alcohol and marijuana usage and a prior misdemeanor drug arrest, we find no abuse of the trial court’s discretion. Generally, evidence of character, a particular character trait, or a prior or subsequent act, is inadmissible to prove that a person acted in conformity therewith on a particular occasion. La. C.E. art. 404(A) and (B). Defendants sought to introduce this evidence to counter the favorable character evidence presented by plaintiff and according to defendants, should have been allowed to do so because such evidence could have been considered by the jury in assessing fault and/or damages, particularly lost future earnings. The proffered evidence related to Henry White’s past alcohol and marijuana usage was very general and, contrary to defendants’ contention, did not come close to showing that Henry White used alcohol or drugs routinely or habitually. Furthermore, the testimony (which would have been from Tiffany Williams, the mother of Henry’s son) concerned the time period in which Henry was in high school, which was three years prior to the incident at issue in the instant case. The arrest in April 2007 was for drug possession; however, it was a misdemeanor deferred prosecution that was subsequently dismissed. As it was not even a conviction, evidence would not be admissible to attack credibility under La. C.E. art. 609(F). See, Ratliff v. LSU Board of Supervisors, 09-0012 (La. [App-4th12 Cir.05/07/10), 38 So.3d 1068, writ denied, 10-1312 (La.09/24/10), 45 So.3d 1079. Furthermore, the relevancy or probative value of this evidence, if any, was far outweighed by its potentially prejudicial effect. See, Shilling v. State ex rel. Dept. of Transportation and Development, 05-0172 (La.App.1st Cir.12/22/05), 928 So.2d 95, unit denied, 06-0151 (La.04/24/06), 926 So.2d 541.

Evidence and Testimony Related to the Income that Henry White III “Could Have” Earned as a Professional Basketball Player

In this assignment of error, defendants contend that it was error for the trial court to allow into evidence the testimony presented by plaintiff on the issue of whether Henry White could have played professional basketball and any income he could have derived therefrom, specifically, the testimony of sports agent, Leigh Stein-berg, economist, Zoe Meeks, and former *813 Grambling head men’s basketball coach, Ricky Duckett.[7] According to defendants, the trial court erred in allowing such speculative evidence regarding Henry White’s possible career in professional basketball to be considered by the jury in their determination of the amount to awarded for future lost earnings.
An award for loss of future earnings is predicated upon the difference between a person’s earning capacity before and after a disabling injury. Folse v. Fakouri, 371 So.2d 1120 (La.1979). Loss of earning capacity refers to a person’s potential and is not necessarily determined by actual hsloss. Brandao v. Wal-mart Stores, Inc., 35,368 (La.App.2d Cir.12/19/01), 803 So.2d 1039, writ denied, 02-0493 (La.04/26/02), 814 So.2d 558; Batiste v. New Hampshire Insurance Co., 94-1467 (La.App.3d Cir.05/03/95), 657 So.2d 168, writ denied, 95-1413 (La.09/22/95), 660 So.2d 472. The injured party need not be working or even in a certain profession to recover such an award. What is being compensated is the person’s lost ability to earn a certain amount and such damages are recoverable even though he may never have seen fit to take advantage of that capacity. Id.; Petrus v. Bain, 32,231 (La.App.2d Cir.09/22/99), 742 So.2d 739. Awards for loss of future income or future earning capacity are inherently speculative and insusceptible of calculation with mathematical certainty. Brandao, supra; Odom v. Claiborne Electric Coop., Inc., 623 So.2d 217 (La.App. 2d Cir.1993), writ denied, 629 So.2d 1171 (La.1993). The trier of fact is accorded broad discretion in assessing such damages but there must be a factual basis in the record for the award. Id.
The trial court has vast discretion in determining whether to admit expert testimony. Johnson v. Morehouse General Hospital, 10-0387 (La.05/10/11), 63 So.3d 87; Ferrara v. Questar Exploration & Production Co., 46,357 (La.App.2d Cir.06/29/11), 70 So.3d 974, writ denied, 11-1926 (La.11/14/11), 75 So.3d 943. Questions of credibility and the weight to be given to expert testimony are to be resolved by the trier of fact. Lasyone v. Kansas City Southern Railroad, 00-2628 (La.04/03/01), 786 So.2d 682. A fact-finder may accept or reject the opinions expressed by an expert, in whole or in part. Green v. K-Mart Corp., 03-2495 (La.05/25/04), 874 Soj2d14 838; Davis v. Foremost Dairies, 45,835 (La.App.2d Cir.02/16/11), 58 So.3d 977, writs denied, 11-0568, 11-0538 (La.04/25/11), 62 So.3d 97, 98. The trier of fact may substitute common sense and judgment for that of an expert when such a substitution seems warranted on the record as a whole. Id.
We note that defendants presented the testimony of Oscar Shoenfelt, a former professional sports agent, to counter the testimony of Leigh Steinberg, and that of Robert Hebert, an expert in forensic economies, to counter the testimony of Zoe Meeks. The trial court, in ruling that the testimony of Steinberg and Ms. Meeks was admissible, found that all of the objections raised by defense counsel to the testimony of these two expert witnesses were not issues of admissibility, but rather went to the weight the jury would place on the testimony. See, Nitcher v. Northshore Regional Medical Center, 11-1761 (La. App.lst Cir.05/02/12), 92 So.3d 1001. Based upon the jury’s award for future lost earnings, it is clear that the'jury relied *814 more upon the evidence presented by defendants’ experts.
During his closing argument, plaintiffs counsel asked the jury to award $4,038,081 to plaintiff for Henry White’s future lost earning capacity; this amount was one amount calculated by plaintiffs CPA expert, Zoe Meeks, based upon a scenario in which Henry White would have played professional basketball, then had a career in broadcasting before obtaining work in his field of study, criminal justice. Ms. Meeks used a personal consumption rate of approximately 24% in calculating the net discounted figures she gave to the jury, which ranged from $798,170 to I ^$5,150,229. Defense counsel in his closing argument urged the jury, in calculating the amount to award plaintiff for Henry’s future lost earnings, to consider the testimony of defense expert, Dr. Robert Hebert, which was that Henry, more likely than not, would have graduated with a degree in criminal justice and pursued employment in that field. Over 35 years, Henry’s base earning capacity would have been $1,418,469; adding in employer benefits, the amount would be $1,775,923 (prior to discounting for present value). After applying a consumption rate of between 63 and 100%, Dr. Hebert projected Henry White’s loss of future earnings to be $593,585.
The jury awarded $780,000, a discounted sum (as evidenced by the jury’s notation of “discounted” beside the amount on the jury verdict form), to plaintiff for Henry White’s future lost earnings. We will never know what figure the jury began with to arrive at this amount, since they did not award any of the figures calculated by plaintiffs or defendants’ expert vntnesses, and they did not specify the rate of discount they used in calculating the award. However, it is clear that the jury evaluated the entirety of the evidence presented before making its own calculation of discounted present value based upon an amount, presumably the one advanced by Dr. Hebert or one based primarily upon his methodology and opinion that, more likely than not, Henry would not have played professional basketball but would have pursued employment in the field of criminal justice, to come up with the amount it awarded for future lost earnings, $780,000. We find no error in the trial court’s admission of the complained of expert testimony.
[^Likewise, the trial court did not err in allowing the testimony of Coach Duckett. The former head men’s basketball coach at Grambling viewed game films of Henry White. Coach Duckett was impressed by Henry’s skills, work ethic and competitiveness as depicted in the game films such that he offered him a scholarship to play basketball at Grambling, with the hopes that Henry could improve the team’s talent level. Coach Duckett’s opinion was that, given two additional years of playing ball at Grambling, Henry’s skills could have improved such that he could have had a chance at playing professional basketball at some level. As such, Coach Duckett’s testimony was relevant to the issue of loss of future earnings/earning capacity. Even if this testimony was somewhat speculative in nature, we observe that apparently the jury chose to give it little weight, as its lost future earnings/earning capacity award was not based upon any of the calculations and projections set forth by plaintiffs experts, but rather was more along the lines of the projected lost future earnings as calculated by defendants’ expert economist.[8]

*815
Testimony of Coaches William Trenkle and Thomas Stallworth

Defendants object to the trial court’s ruling allowing both coaches to testify, urging that their testimony was inadmissible hearsay opinion testimony. Generally, a -witness not testifying as an expert may not give |17testimony in the form of opinions or inferences. This rule, however, is subject to the limited exception set forth in La. C.E. art. 701, which states that a lay witness may provide testimony in the form of opinions or inferences where those opinions or inferences are rationally based upon the perception of the witness and helpful to a clear understanding of his testimony or determination of a fact at issue. Merrells v. State Farm Mutual Automobile Insurance Co., 33,404 (La. App.2d Cir.06/21/00), 764 So.2d 1182; Cho v. Royal Oldsmobile Co., Inc., 98-527 (La.App.5th Cir.11/25/98), 722 So.2d 1138. As with other types of evidence and testimony, the trial court is vested with vast discretion in determining first, which opinion testimony shall be received into evidence and second, whether it will be received as lay or expert testimony. Id.
The videotaped deposition of William Trenkle was played for the jury. Coach Trenkle was/is the head coach of the men’s basketball team at Hill College in Hillsbor-ough, Texas. Plaintiffs counsel asked Coach Trenkle a series of questions initially, the answers to which established the coach’s experience and expertise as a men’s college basketball coach. Coach Trenkle then stated that Henry White played junior college basketball at Hill College for one year. Henry was a very hard worker, a player who was willing to “put it all on the court” every day. According to Coach Trenkle, such a player strives to and usually finds a way to succeed.
Examples of Henry’s work ethic given by Coach Trenkle included: attendance at every practice and workout, even those that were not mandatory, but were held to give the guys “free shooting” opportunities and 11Rto show the coaching staff who had the motivation to work harder; attendance at not just every mandatory study hall, but extra independent study sessions, because academics did not come easy to Henry but he nonetheless made it a priority; and, possession of a level of competitiveness that not all players had. Henry played hard; he dove to the floor or jumped for a loose ball, even when it went into the stands; took a charge willingly; and played guard defensively even when he was tired.
As one of the team’s players in the number 2-guard or number 3-guard position, Henry was a ball handler with versatility. These two positions require a player who has multiple skills which include helping with the press; filling in as point guard when needed; and penetrating from the perimeter into the lane to match up against a larger player to score and rebound. Although he only had Henry White for one school year and basketball season, Coach Trenkle opined that with two more years of development and improvement, Henry had a “good chance” to play professional basketball “at some level.” Kids he has coached who made it to *816 the pros had a work ethic like Henry’s as well as agents “with connections.” According to Coach Trenkle, it was Henry’s work ethic that would have given him the chance to play and move up in the professional leagues.
The trial court did not err in allowing Coach Trenkle’s testimony. As a college basketball coach with many years of experience, and in particular, as Henry White’s college basketball coach, William Trenkle was certainly qualified to testify as to his firsthand observations of Henry’s skills and | ^performance as a basketball player, as well as to his opinion, based upon his experience as Henry’s coach, as to Henry’s chances of playing professional basketball. See, McFann v. Southwestern Power Electric Co./AEP, 40,384 (La.App.2d Cir.12/14/05), 916 So.2d 1277; Merrells, supra. We note that Coach Trenkle’s testimony was simply that Henry White, given his work ethic and skills, which were still developing, could have possibly played pro basketball at some level. Furthermore, in light of the fact that it does not appear that the jury based its future lost earnings/earning capacity award on a finding that Henry White would have played professional basketball, but rather agreed with defendants’ expert economist’s recommendations and conclusions, the admission of this testimony, even if erroneous, was harmless.
Before ruling on the admissibility of Coach Stallworth’s testimony, a ruling which made on the fourth day of trial, the trial judge made the following observations:
[O]n August 14, 2009, [Coach Stallworth was] the strength and conditioning coach at Grambling ... As a practical matter, he was apparently assigned to just handle and supervise and instruct on weightlifting[Although his title was strength and conditioning coach].
I understand the contemporaneous objections made by the defense counsel with regard to the particular questions asked of [Coach] Stallworth. There are issues of hearsay; however, this testimony and this evidence come along on day four of this trial and in terms of the basic events of the date and the general time frame and the orders given to Henry White and the nature of the run and even the temperature range, all of that really has been established and it’s really not much in dispute.
I am a little bit concerned about the hearsay nature of some of the questions. I note that [Coach] Stallworth ... was not tendered as an expert. I suppose he could have been but wasn’t and he does give impressions and he does give opinions regarding certain matters....
|20In reviewing [Coach] Stallworth’s deposition trial testimony it’s my view that the objections by defense counsel should be overruled.... [I]n the overall analysis it’s my bottom line view that this is admissible and the jury can give the testimony the weight it deserves, if any.
The videotaped deposition of Thomas Stallworth, former strength and conditioning coach at Grambling, was then played for the jury. Coach Stallworth testified as to his education and experience as a strength and conditioning coach, and noted that Grambling, as would any university or college, has the duty to supervise, instruct and prepare its coaches and athletes to minimize the risk of heatstroke and other heat-related injuries. As Grambling’s strength and conditioning coach, he was the person the athletic director, trainer and coaches were to communicate with/consult regarding workouts and athlete safety during workouts. Coaches of individual sports had the option to ask him for strength and conditioning workouts and advice, but ultimately it was the coach *817 es’ decision to choose whether to consult with him or plan their own workouts.
According to Coach Stallworth, the men’s basketball coaches put him in charge of the strength training aspect of the players’ workout, but they did not consult him about the conditioning/running aspect of the workout. Coach Stallworth noted that a proper conditioning program includes consideration of where (indoors or outdoors) and when (time of day) to conduct the run; distance or time; frequency; proper hydration; proper supervision; and the intention behind the workout — speed development? conditioning? or strictly disciplinary? Had he been in charge of the run on August 14, 2009, he would have taken all of the above into consideration, biand made the following changes: the players would not have been made to run outdoors, in temperatures exceeding 100 degrees, for a distance of 4.5 miles, only 15 minutes after a lengthy strength training session. Coach Stallworth stated that he would have set the run for early morning or late evening; made it a shorter distance and on a level surface; and only held the run after all the players had become acclimated to the heat.
We find no error in the trial court’s ruling allowing Coach Stallworth’s testimony. Clearly the coach possessed suitable information, experience and training in the field of strength and conditioning to provide his lay opinion as to the safety and reasonableness of the August 14, 2009, run, and to give his testimony regarding the way he would have conducted the run had he been consulted. Furthermore, this testimony was cumulative, and simply repetitive of that given by athletic trainer, Jessica Robinson, as well as strength and conditioning experts, Kyle Pierce and Douglas Cosa, both of whom expressed in no uncertain terms that the August 14, 2009, run should never have been held under those particular conditions without proper supervision, a hydration protocol and an adequate staff trained in the prevention and treatment of heatstroke.

Jury Instruction on Limitation of Damages-La. R.S. 13:5106

According to defendants, the trial court erroneously instructed the jury regarding the statutory cap on damages set forth in La. R.S. 13:5106. Rather than fully informing the jury of the provisions of La. R.S. 13:5106, the court instead improperly summarized only one subsection of the statute, urge defendants.
LaThe trial court has a duty to instruct jurors on the law applicable to the cause submitted to them. La. C.C.P. art. 1792(B). The trial judge is under no obligation to give any specific jury instructions that may be submitted by either party; the judge’s duty is to correctly charge the jury. Adams v. Rhodia, 07-2110 (La.05/21/08), 983 So.2d 798; Simmons v. Christus Schumpert Medical Center, 45,-908 (La.App.2d Cir.06/15/11), 71 So.3d 407. Adequate instructions are those which fairly and reasonably point out the issues and provide correct principles of law for the jury to apply to those issues. Id.
Trial courts are given broad discretion in formulating jury instructions and a trial court’s judgment should not be reversed so long as the charge correctly states the substance of the law. Adams, supra. In order to determine whether an erroneous jury instruction was given [or one which should have been given was omitted], reviewing courts must assess the targeted portion of the instruction in the context of the entire jury charge to determine if the charges adequately provide the correct principles of law as applied to the issues framed in the pleadings and the evidence and whether the charges adequately guided the jury in its determina *818 tion. Wooley v. Lucksinger, 09-0571 (La.04/01/11), 61 So.3d 507; Adams, supra.
The trial court gave detailed reasons on the record in support of its decision to include an instruction to the jury on the statutory cap applicable to suits against the state and its political subdivisions and agencies.[9] On the l^final day of court, the trial court observed the following regarding the inclusion of an instruction regarding the statutory cap in its charge to the jury:
The defense has vigorously opposed the jury being advised of the cap even though initially I believe it was a motion in limine or a proposed jury charge by the defense in which they sought to advise the jury of the cap, they withdrew that [on the fourth day of trial]. And subsequent to that, plaintiffs filed a motion to include reference to the cap and the exclusions to the cap in the jury charge....
The rationale for allowing [such an instruction] is that the jury would receive the truth of what the law is. They would be able to have some clarity about what is subject to the cap and what’s not, and I think it really does promote transparency and clarity in that respect in their deliberative process....
A political statement under Section (E) [of La. R.S. 13:5106] is another matter so we’ll have to address that later ... but for the time being the Court is going to allow requested Jury Charge Number 30.
After closing arguments, and outside of the presence of the jury, the trial judge revisited the issue of the jury instruction on La. R.S. 13:5106. Defense counsel had filed additional jury instructions they sought to have included: (1) the entirety of La. R.S. 13:5106; (2) in the alternative, an instruction containing the language from Subsection (E). The trial court stated:
1241 believe that inclusion of (E) in the jury charge would have been totally inappropriate .... My viewpoint was that Paragraph (E) was totally inappropriate and injects into the instructions that I would read to the jury a political statement by the legislature and so for that reason I did exclude it.... I specifically said this all along this morning that you could argue [in your closing argument] rationale [behind the statutory cap on damages] and that I would not stop you unless it was inflammatory language. In my opinion, Paragraph (E) really contains inflammatory language and, therefore, it is correct I precluded you from arguing and reading Paragraph (E). I did not prohibit you from arguing rationale for both the ceiling and for the exceptions to the ceiling set forth in 5106 and then you fashioned your closing argument accordingly.
*819 Defense counsel then noted that defendants wanted an instruction to include Subsection (D)(2) of La. R.S 13:5106, which defined the economic loss of earnings and loss of support as applicable to suits against the state, its political subdivisions and agencies. In response, the trial judge observed:
The Court sought to strike an appropriate balance to give the jury the principles applicable and I believe that the jury instruction was correct.... I did not feel that reading just simply this paragraph, which is Part (D) of 5106, was an appropriate and correct and full statement of the law so for that reason I did not read Paragraph (D)(2). I think that the provision that I read to the jury is an accurate statement of the law, it gives them the ability to weigh and balance the various future economic testimony that they heard....
We have examined the entirety of the trial court’s charge to the jury, as well as the instructions proposed by defendants, and find that the judge fulfilled his duty in charging the jury as to the law applicable to this case in a manner which reduced the possibility of confusing the jury and which prevented counsel from arguing law to the jury deemed by the judge to be inappropriate in light of the particular facts of this case. See, Smart v. Kansas City Southern Railroad, 36,404 (La.App.2d Cir.11/06/02), 830 So.2d 581; Kennedy v. Thomas, 34,530 (La.App.2d Cir.04/04/01), 784 So.2d |¾692; LaFrance v. Bourgeois, 97-376 (La.App.5th Cir.10/15/97), 701 So.2d 1026, writ denied, 97-2865 (La.02/13/98), 706 So.2d 995; Belle Pass Terminal, Inc. v. Jolin, Inc., 92-1544 (La.App.lst Cir.03/11/94), 634 So.2d 466, writ denied, 94-0906 (La.06/17/94), 638 So.2d 1094.

Recognition of Wisconsin Paternity Judgment

To recover under a claim for wrongful death and survival, a plaintiff must fall within the class of persons designated as a beneficiary as set forth in La. C.C. arts. 2315.1 and 2315.2. The first category of beneficiaries in both wrongful death and survival actions includes “children” of the decedent. Turner v. Bushy, 03-3444 (La.09/09/04), 883 So.2d 412; Reese v. State, Dept, of Public Safety & Corrections, 03-1615 (La.02/20/04), 866 So.2d 244. La. C.C. art. 3506(8) defines children as those persons born of the marriage, those adopted, and those whose fili-ation to the parent has been established in the manner provided by law.
The petition in the instant action, which was filed on March 9, 2010, in addition to seeking damages for wrongful death and survival, also was one for filiation. In the petition, Tiffany Williams, mother and natural tutor of Gavin Williams, alleged that Gavin, who was born on October 25, 2007, was the biological child of Henry L. White, III. Tiffany further alleged that while she and Henry were never married, Henry nonetheless informally acknowledged Gavin as his son and had a father/son relationship with Gavin until his death on August 26, 2009. As a child not born of the marriage or adopted, Gavin’s biological relationship to Henry had to be established in order for him to recover wrongful death and survival ^damages. See, Thomas v. Sister of Charity of the Incarnate Word Shreveport, 97-1443 (La.07/08/98), 713 So.2d 466; Lewis v. Transocean Terminal Operators, Inc., 02-0152 (La.App.4th Cir.12/11/02), 834 So.2d 1180, writs denied, 03-0080, 03-0111 (La.03/28/03), 840 So.2d 572.
Prior to Henry’s death, in Wisconsin, the home state of both Tiffany and Henry, a paternity/child support action had been instituted. In 2008, having used up her leave time from work, Tiffany applied for extended maternity leave benefits from the *820 state of Wisconsin. State law required that child support/paternity proceedings be instituted at that time. Henry admitted his paternity of Gavin, but a formal acknowledgment via affidavit was not executed. During the pendency of the Wisconsin proceedings, Henry died. A DNA test revealed a 99.2 % probability that Henry was Gavin’s biological father. Based upon the DNA evidence, on August 10, 2010, the Wisconsin court issued a judgment of paternity establishing that Henry was Gavin’s legal father and changing Gavin’s name to Gavin Isaiah Williams-White. His birth certificate was also changed.
On October 28, 2010, plaintiff filed an ex parte petition to make the Wisconsin paternity judgment executory in Louisiana in accordance with La. R.S. 13:4242. An order recognizing this out-of-state judgment and making it the judgment of the trial court was signed by the trial judge on the date that the ex parte petition was filed. Notice of the ex parte petition and judgment was mailed to defendants, who responded by filing their answer and exceptions, inter alia, of no right and no cause of action on November 3, 2010. Two days later, defendants filed a motion to set aside the October |⅞728, 2010, judgment, or, in the alternative, for a new trial or the suspension of the effect of the judgment. Defendants urged several procedural grounds as the bases upon which the ex parte judgment should have been overturned/suspended, but their motion was denied.
On appeal, defendants assign as error the trial court’s recognition of the Wisconsin judgment of paternity. According to defendants, not only did plaintiffs fail to comply with the procedural requisites, but the trial court’s adoption and recognition of the out-of-state judgment of paternity improperly prohibited them from introducing any evidence to controvert that offered by plaintiff to establish filiation and Gavin’s right to sue for Henry White’s wrongful death and survival damages.
A party seeking to have a foreign judgment made executory in Louisiana has two options: to seek enforcement via the filing of an ex parte petition pursuant to La. R.S. 13:4241 et seq., which is what plaintiff did in the instant case, or to bring an ordinary proceeding against the judgment debtor pursuant to La. C.C.P. art. 2541.
La. R.S. 13:4242 provides that:
A copy of any foreign judgment authenticated in accordance with an act of congress or the statutes of this state may be annexed to and filed with an ex parte petition complying with Code of Civil Procedure Article 891 and praying that the judgment be made executory in a court of this state. The foreign judgment shall be treated in the same manner as a judgment of a court of this state. It shall have the same effect and be subject to the same procedures, and defenses, for reopening, vacating, or staying as a judgment of a court of this state and may be enforced in the same manner.
A review of the record shows that plaintiff complied with the requirements of La. R.S. 13:4242, and, bound by the principles of the Full 12sFaith and Credit clause, U.S. Const. Art. 4, § 1, and La. R.S. 13:4241, the trial court correctly recognized the Wisconsin paternity judgment and ordered that it be made executory in the 1st JDC.[10] The effect of this judgment was, as asserted by defendants, to establish Gavin’s filiation to Henry White, III, which *821 therefore precluded them from presenting any evidence to the contrary at the trial of this matter.[11] Absent this judgment, which we note is based upon DNA test results, the issue of filiation would not have been conclusively established, and plaintiffs and defendants would have been able to introduce all relevant evidence to establish paternity (or the lack thereof). See Comment (C), La. C.C. art. 197.[12] However, we observe that the record in this case contains overwhelming evidence that Henry White, III, had informally acknowledged Gavin as his son prior to his 129death. In fact, in the Wisconsin proceedings, he acknowledged paternity, albeit not in the requisite affidavit format.

Conclusion

For the reasons set forth above, the judgment of the trial court is AFFIRMED. To the extent allowed by law, costs are assessed to defendants-appellants, the Board of Supervisors for the University of Louisiana System, also known as the Louisiana Board of Trustees for State Colleges and Universities, and Grambling State University.

. The petition filed by Tiffany Williams was captioned a "Petition for Damages and Filiation of the Minor Child, Gavin Williams, to Henry L. White, III, Deceased.” Tiffany and Henry, both residents of Wisconsin, had a relationship while they were in junior college, and Gavin was bom in October 2007. Tiffany sought to establish the paternity of Gavin via the petition in the instant case for procedural reasons. Although in 2008 the State of Wisconsin had instituted a proceeding to determine the child’s paternity (in conjunction with Tiffany’s request for state services), a judgment recognizing Henry’s paternity of Gavin was not rendered until after the instant suit was filed. Establishment of Gavin’s filiation to Henry and his right to bring the wrongful death and survival claims was necessary because Henry’s mother had also filed a separate wrongful death and survival claim asserting that she had the right to bring both actions as Henry’s surviving parent pursuant to La. C.C. arts. 2315.1 and 2315.2.

. In her testimony, Ms. Robinson stated that the "Tiger Mix" (the name given to the run by the basketball coaches) was dangerous. No one with the basketball program told her beforehand about the run, which should have been done as she is to be informed of all athletic practices beforehand. Had she known about the run, she could have been prepared to assist, As it was, when she got the call about Henry White's condition, she had just ended a scheduled football practice because of that afternoon's extreme temperature. At that time, she was Grambling’s only certified athletic trainer, although she had a part-time assistant and several student helpers. The fall sports in season on the date of the basketball "Tiger Mix” were football, soccer and volleyball, and she rotated among those.

. Ms. Robinson testified that before the EMTs could even leave the gym, there was another athlete, Jacoby Lee, down with heatstroke symptoms. She and the players began icing him down, and because the first unit had already left with Henry White, another ambulance had to be called.

. Also excluded were: argument or statements by defense counsel that a verdict for *810 plaintiff would cause an increase in insurance premiums; and, evidence which would have been barred under the collateral source rule, i.e., Social Security and/or Medicare payments.

. The actual instruction given to the jury by the judge was:
In a suit against the state or its political subdivisions for personal injury or wrongful death, the state’s liability for damages shall not exceed five hundred thousand dollars. Specifically excluded from this limitation, and therefore not subject to the five hundred thousand dollar limit, are the following: medical care and related benefits, loss of earnings, and loss of future earnings.

. The trial court revisited its ruling on the marijuana references and THC positive test result on the last day of trial and observed:
Based on Dr. Thoma’s expert opinion and testimony, which I reviewed pretrial, coupled with the fact that possession of marijuana is a misdemeanor criminal offense in the State of Louisiana, it is my view that evidence of marijuana usage the night before [the run] did not pass the article 403 balancing test in the Louisiana Code of Evidence and, therefore, the marijuana references were excluded in my gatekeeping function.
*812 I overruled the plaintiff with respect to his request that the alcohol consumption be excluded. Dr. Thoma also had a very distinct and clear opinion about that, and we've heard that actually in the trial of the case, but it was my view that that was important in terms of the dehydration issues as that might relate to the heatstroke which the decedent, Henry L. White, III, sustained the afternoon after the night of being out with his friends.
So, again, the Court seeks to strike an appropriate balance between what is admissible and what is not and what is unduly prejudicial and what is probative. It is my view that the marijuana reference, particularly given Dr. Thoma’s opinion, that it had absolutely zero to do with anything regarding the heatstroke. That was compelling for the Court and I exercised my gatekeep-ing function, which I’m required to do sitting here in the courtroom in the trenches dealing with evidentiary issues....
I have to make decisions based on the Code of Evidence and the nature and flavor of the case as it’s presented and I do my best to do that.... [M]y viewpoint was that the prejudicial effect outweighed the probative value, given Mr. Thoma’s opinion. So, for that reason, the marijuana references and the THC [were] excluded from admissible evidence in this case.

. Defendants take issue with that portion of Coach Duckett’s testimony in which he discusses/evaluates Henry White’s basketball skills. Defendants have also asserted error in the trial court’s evidentiary ruling regarding similar testimony from Coach Trenkle, which will be addressed infra.

. Additionally, this testimony was also cumulative; former Asst. Coach Portland had already testified that he was the coach who recruited Henry to come to Grambling based *815 upon his ball-handling and shooting skills (one dunk in particular) the coach observed at a junior college tournament in Texas. Coach Portland also noted that Henry was in great shape and could jump, play defense, run fast, play the post as well as the guard position, rebound, and shoot the three-pointer. Coach Portland felt that Henry was a kid with character who spoke well and was very well-mannered, in addition to having a great work ethic. Had Henry developed further, Coach Portland opined that he had the potential to play basketball at a professional level.

. The instruction initially proposed by defendants and accepted by plaintiff (and the trial court) was:
The total liability of the State and political subdivisions for all damages for the wrongful death of any one person, including any claims and derivative claims, exclusive of property damage, medical care and related benefits and loss of earnings or loss of support and loss of future support, as provided in this section, shall not exceed $500,000, regardless of the number of suits filed or claims made for the wrongful death of any one person.
Thereafter, once defendants withdrew their proposed instruction, plaintiff filed the following instruction, which was incorporated into the charge to the jury by the trial court:
In a suit against the State or its political subdivisions for personal injury or wrongful death, the State’s liability for damages shall not exceed $500,000. Specifically excluded from this limitation, and therefore not subject to the $500,000 limit in this case are the following: medical expenses of Henry White, III, and future wage loss or loss of earning capacity of Henry White, III.

. Louisiana courts are required to give full faith and credit to judgments of courts of other states. Succession of Bickham, 518 So.2d 482 (La.1988); Lepard v. Lepard, 31,351 (La.App.2d Cir. 12/09/98), 722 So.2d 367. The only exception to this is when it is shown that *821 the foreign court lacked jurisdiction over a party or the subject matter, Lepará, supra, and no such allegations have been made regarding the Wisconsin paternity proceedings.

. When the issue of paternity has been determined in another jurisdiction, such a finding or judgment is res judicata and will be afforded full faith and credit. Cesar C. v. Alicia L., 281 Neb. 979, 800 N.W.2d 249 (Neb.2011); Matter of Gendron, 157 N.H. 314, 950 A.2d 151 (N.H.2008); Florida, State Dept, of Health and Rehab. Services on Behalf of Huggins v. Heidler, 629 So.2d 1073 (Fla.App.2d Dist. 1994); Matter of Michael H. v. Carole S.D., 198 A.D.2d 414, 604 N.Y.S.2d 573 (N.Y.A.D.2d Dept. 1993); In re Paternity of Nathan T„ 174 Wis.2d 352, 497 N.W.2d 740 (Wise.App. 1993); Buss and Smith v. Buss, 161 Wis.2d 935, 469 N.W.2d 249 (Wisc.App. 1991); Wade v. Geren, 743 P.2d 1070, 1987 OK 81 (Okla.1987); Ely v. Derosier, 123 N.H. 249, 459 A.2d 280 (N.H.1983); Luedtke v. Koopsma, 303 N.W.2d 112 (S.D. 1981); Matter of Robertson v. Callings, 101 Misc.2d 808, 421 N.Y.S.2d 999 (N.Y.Fam.Ct. 1979).

. Examples of such relevant evidence include blood tests, an informal acknowledgment, and cohabitation of the mother and father at the time of conception. In Louisiana, paternity or filiation is not an issue for the jury to consider or decide, but rather is an issue of law. La. C.C.P. art. 1732(3); Ratliff v. LSU Board of Supervisors, 09-0012 (La. App.4th Cir.05/07/10), 38 So.3d 1068, writ denied, 10-1314 (La.09/24/10), 45 So.3d 1080.